Paul M. BOKULICH, Willie Carter, Sr., John Head, Rev. Percy McShan, on their own behalf and on behalf of all others similarly situated, Plaintiffs,
and
George Greene and Hubert G. Brown, Intervenors-Plaintiffs,

v.

JURY COMMISSION OF GREENE COUNTY, ALABAMA, Walter Morrow, Albert Gray, and Melvin Durrette, as members of the Jury Commission of Greene County, Alabama, Mary C. Yarborough, as Clerk of the Jury Commission of Greene County, Alabama, E. F. Hildreth, as Circuit Judge for the 17th Judicial District of Alabama, T. H. Boggs, as District Attorney for Greene County, Alabama, Ralph Banks, Jr., as County Attorney for Greene County, Alabama, and Lurlene B. Wallace, as Governor of the State of Alabama, Defendants.

Civ. A. No. 66–562.

United States District Court
N. D. Alabama, W. D.
Sept. 13, 1968.

Donald A. Jelinek, Lawyers Constitutional Defense Committee, Selma, Ala., Alvin J. Bronstein, Lawyers Constitutional Defense Committee, Jackson, Miss., Arthur Kinoy, William M. Kunstler, New York City, Morton Stavis, Harriet S. Van Tassel, Dennis J. Roberts, Newark, N. J., Orzell Billingsley, Jr., Birmingham, Ala., Norman Amaker, New York City, for plaintiffs.

Richmond M. Flowers, Atty. Gen., MacDonald Gallion, Atty. Gen., Robert P. Bradley, Asst. Atty. Gen., State of Alabama, Montgomery, Ala., Thomas H. Boggs, Solicitor 17th Judicial Circuit of Alabama, Linden, Ala., Ralph Banks, Jr., County Atty., for Greene County, Alabama, Eutaw, Ala., for defendants.

Before GODBOLD, Circuit Judge, and GROOMS and ALLGOOD, District Judges.

GODBOLD, Circuit Judge:

This suit is an attack on the jury system of Greene County, Alabama. The plaintiffs charge that there is systematic exclusion of Negroes from grand and petit juries by reason of purposeful discrimination, in violation of the Constitution of the United States and the Constitution of the State of Alabama. They charge that Tit. 30, §§ 4 and 21 of the Code of Alabama (1958) establishing qualifications for jurors are, on their face and as applied, in violation of the Fourteenth Amendment to the Constitution of the United States. And they claim that the all-white jury commission of Greene County is unconstitutionally constituted.

Both declaratory and injunctive relief are sought. Jurisdiction of this court is invoked under 28 U.S.C.A. § 1343 and 42 U.S.C.A. § 1983. A three-judge court has been convened pursuant to 28 U.S.C.A. § 2281. Notice of the suit has been given to the Attorney General and Governor of Alabama as required by 28 U.S.C.A. § 2284(2).

The court has considered the evidence consisting of oral testimony, testimony by deposition, numerous exhibits, and stipulations of the parties, and pursuant to Fed.R.Civ.P. 52 makes and enters in

this opinion the appropriate findings of fact and conclusions of law.

Each plaintiff sues on his own behalf and, pursuant to Fed.R.Civ.P. 23, on behalf of a class of those similarly situated. Plaintiff Paul Bokulich is a white civil rights worker associated with the Southern Christian Leadership Conference. He was arrested in Greene County and charged with two counts of grand larceny. His arrest followed soon after a sharply-contested primary election in which Negroes were successful candidates for county office. Plaintiffs Willie Carter, Sr., John Head and Rev. Percy McShan are Negro residents of Greene County who allege that they are qualified under the laws of Alabama to serve as jurors in the Circuit Court of Greene County and desire to serve but never have been summoned for jury service. Plaintiffs-intervenors George Greene and Hubert G. Brown are Negro civil rights workers for the Student Non-Violent Coordinating Committee. While working in Greene County in connection with the general election to be held in November 1966 they were arrested on charges of grand larceny.

Temporary restraining orders have been granted against presentation to the Greene County grand jury of charges against Bokulich, Greene and Brown.

The defendants are the members and the clerk of the Greene County jury commission, the Circuit Judge and District Attorney of the state judicial circuit in which Greene County is located, the County Attorney, and the then Governor of Alabama.

The claim of systematic exclusion of Negroes from the Greene County jury roll has been in the courts before. Coleman v. Barton, No. 63–4, N.D.Ala., June 10, 1964, was a suit against the members and clerk of the jury commission. The district judge granted a declaratory judgment but on grounds of comity declined to grant injunctive relief. Per-

tinent extracts from the judgment then entered are as follows:

"1. The Jury Commission of Greene County, Alabama, is under a statutory duty of seeing that the names of every person possessing the qualifications to serve as jurors, and not exempt by law from jury duty, be placed on the jury roll and in the jury box of said County.

"2. The Clerk of the Jury Commission of Greene County, Alabama, is under a duty to comply with Section 24 of Title 30 of the Code of Alabama, 1940, to visit every precinct in Greene County at least once a year to enable the Jury Commission to properly perform its duties as commissioners as required by law.

"3. The jury commissioners of Greene County, Alabama, are under a duty to familiarize themselves with the qualifications of eligible jurors without regard to race or color.

"4. The jurors be selected and the roll made up and the box filled on the basis of individual qualifications and not as a member of a race.

"5. No person otherwise qualified be excluded from jury service because of his race.

"6. The Commission not pursue a course of conduct in the administration of its office which will operate to discriminate in the selection of jurors on racial grounds.

"7. In making up and establishing the jury roll and in filling the jury box mere symbolic or token representation of Negroes will not meet the constitutional requirements and that numerical or proportional limitations as to race are forbidden.

"8. The jury roll and the jury box as presently constituted be examined for compliance with these standards and the declaration herein made."

Contemporaneously the same Coleman was making his way through the state courts, and the United States Supreme Court, on a direct appeal from a conviction of murder in Greene County.[1] The

1. Coleman v. State, 276 Ala. 513, 164 So.2d 704 (1963), rev'd, 377 U.S. 129, 84 S.Ct. 1152, 12 L.Ed.2d 190 (1964), remanded after reversal to trial court for

conclusion of the United States Supreme Court in its second opinion, 389 U.S. 22, 88 S.Ct. 2, 19 L.Ed.2d 22, was that Coleman had established a prima facie case of denial of equal protection by systematic exclusion of Negroes from Greene County juries, and the state had not adduced evidence sufficient to rebut the prima facie case.

### 1. Standing.

 Brown and George Greene are Negroes, charges against whom are proposed to be submitted to the grand jury. Their standing to sue is apparent. Bokulich does not lack standing because he is white. Rabinowitz v. United States, 366 F.2d 34 (5th Cir. 1966); Labat v. Bennett, 365 F.2d 698 (5th Cir. 1966); United States v. Hunt, 265 F.Supp. 178 (W.D.Tex., 1967); Allen v. State, 110 Ga.App. 56, 137 S.E.2d 711 (1964); State v. Lowry, 263 N.C. 536, 139 S.E.2d 870 (1965).[2]

 Head was shown to meet standards for jurors established by Alabama law.[3] We find that he represents the interests of a class composed of Negro citizens of Greene County qualified un-

der state law for jury service, entitled to be considered for such service, and in such consideration to have applied to them non-discriminatory standards and procedures, and as such he has standing to sue. Billingsley v. Clayton, 359 F.2d 13 (5th Cir.), cert. denied 385 U.S. 841, 87 S.Ct. 92, 17 L.Ed.2d 74 (1966); White v. Crook, 251 F.Supp. 401 (M.D. Ala.1966); Mitchell v. Johnson, 250 F. Supp. 117 (M.D.Ala.1966); Brown v. Rutter, 139 F.Supp. 679 (W.D.Ky.1956).

### 2. The selection methods of the jury commission.

There is a jury commission of three members in each county appointed by the governor. The clerk of the Circuit Court may be employed as clerk of the commission, Tit. 30, § 15, and in Greene County was so employed. The commission is charged with the duty of preparing a jury roll containing the name of every citizen living in the county who possesses the prescribed qualifications and who is not exempted by law from serving on juries. Tit. 30, §§ 20, 21 and 24. Tit. 30, § 21 prescribes the qualifications and is quoted in the margin.[4]

hearing on motion for new trial, 276 Ala. 518, 164 So.2d 708 (per curiam), 280 Ala. 509, 195 So.2d 800 (affirming trial court's denial of motion for new trial), rev'd, 389 U.S. 22, 88 S.Ct. 2, 19 L.Ed. 2d 22 (1967) (per curiam), judgment affirming trial court vacated, conviction annulled and remanded with direction to quash the indictment, Nov. 27, 1967, unpublished order, Ala.Sup.Ct. (2d Div. 487).

2. Murphy v. Holman, 242 F.Supp. 480 (M.D.Ala.1965), Blauvelt v. Holman, 237 F.Supp. 385 (M.D.Ala.1964), Hollis v. Ellis, 201 F.Supp. 616 (S.D.Tex.1961), and Alexander v. State, 160 Tex.Cr.R. 460, 274 S.W.2d 81, cert. denied 348 U.S. 872, 75 S.Ct. 108, 99 L.Ed. 686 (1954), hold that a white man may not raise the issue of exclusion of Negroes from the jury. In none of those cases was there shown to be substantial identity of interest or concern of the complaining party with the group alleged to be excluded. We are concerned with the essential realities of the situation. The case in which the complaining party is of the same racial group as that alleged to be

excluded is the clearest instance of potential violation of equal protection, but it does not set the outer limits of equal protection guarantees or of the right to complain of violations thereof. Nor does the "same class" theory limit due process, the requirements of basic fairness of trial and the integrity of the fact finding process. In the exclusion of an identifiable class from jury service equal protection and due process merge. Labat v. Bennett, supra; United States ex rel. Goldsby v. Harpole, 263 F.2d 71, 81 (5th Cir. 1959).

3. There was no such proof as to McShan and Carter.

4. "Section 21. The jury commission shall place on the jury roll and in the jury box the names of all citizens of the county who are generally reputed to be honest and intelligent and are esteemed in the community for their integrity, good character and sound judgment; but no person must be selected who is under twenty-one or who is an habitual drunkard, or who, being afflicted with a permanent disease or physical weakness is unfit to discharge the duties of a juror; or

The statutory scheme for the selection process begins with the names of substantially all persons potentially eligible for jury service and that group then is narrowed to exclude those not eligible. Sec. 18 provides:

> The clerk of the jury commission shall, under the direction of the jury commission obtain the name of every citizen of the county over twenty-one and under sixty-five years of age and their occupation, place of residence and place of business, and shall perform all such other duties required of him by law under the direction of the jury commission.[5]

This section, as well as §§ 20 and 21, was amended by Act No. 285, Acts of Alabama, Special Session 1966, p. 428, adopted September 12, 1966, so as to embrace all citizens rather than male citizens only.

The commission is directed to require the clerk to scan the registration lists, the tax assessor's lists, any city directories and telephone directories "and any and every other source of information from which he may obtain information, and to visit every precinct at least once a year." Tit. 30, § 24.

■ Necessarily there are two steps in the selection of jurors for the jury roll. First there must be a selection of persons to be considered, i. e., the persons to whom the commissioners are to apply the statutory qualifications. Then the criteria of the statutes must be applied to those who are up for considera-

tion.[5-A] The end product of the system established by the Alabama legislature is placing on the jury roll the names of all adult persons who are qualified and not exempted. "The jury commission * * shall make in a well bound book a roll containing the name of every citizen living in the county who possesses the qualifications herein prescribed and who is not exempted by law from serving on juries." Tit. 30, § 20. "The jury commission shall place on the jury roll and in the jury box the names of all citizens of the county who are generally reputed (etc)." Tit. 30, § 21. "The jury commission is charged with the duty of seeing that the name of every person possessing the qualifications prescribed in this chapter to serve as a juror and not exempted by law from jury duty, is placed on the jury roll and in the jury box." Tit. 30, § 24. These directions of the statute have been reaffirmed by the Supreme Court of Alabama:

> The first step [in obtaining jurors to serve on grand and petit juries] is to get only qualified men on the jury roll. That is those having the qualifications prescribed by law and not exempt. The names of all such men in the county should be placed on the roll and in the box every year.

Fikes v. State, 263 Ala. 89, 95, 81 So.2d 303, 309 (1955), rev'd on other grounds, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957), and by the Court of Appeals of Alabama, Inter-Ocean Casualty Co. v. Banks, 32 Ala.App. 225, 23 So.2d 874 (1945). Failure to put on the roll the

---

cannot read English or who has ever been convicted of any offense involving moral turpitude. If a person cannot read English and has all the other qualifications prescribed herein and is a freeholder or householder his name may be placed on the jury roll and in the jury box. No person over the age of sixty-five years shall be required to serve on a jury or to remain on the panel of jurors unless willing to do so. When any female shall have been summoned for jury duty she shall have the right to appear before the trial judge, and such judge, for good cause shown, shall have the judicial discretion to excuse said person from jury

duty. The foregoing provision shall apply in either regular or special venire."

5. Under § 21 persons over the age of 65 are not required to serve but may do so if willing.

5-A. "The sole purpose of these requirements [of the full list directed by § 18, and use of the sources of information directed by § 24 to be considered] is to insure that the jury commissioners will have as complete a list as possible of names, compiled on an objective basis, from which to select qualified jurors." Mitchell v. Johnson, 250 F.Supp. 117, 123 (M.D.Ala.1966).

name of every qualified person may not be the basis for quashing an indictment or venire absent fraud or a denial of constitutional rights, Fikes v. State, *supra*, 263 Ala. at 96, 81 So.2d at 309, but substantial compliance with these legislative safeguards established to protect litigants and to insure a fair trial by an impartial jury is necessary in order to safeguard the administration of justice. Inter-Ocean Casualty Co. v. Banks, *supra*.

The manner in which the system actually works in Greene County is generally as follows. The clerk does not obtain the names of all potentially eligible jurors as provided by § 18, in fact was not aware that the statute directed that this be done and knew of no way in which she could do it. The starting point each year is last year's roll. Everyone thereon is considered to be qualified and remains on the roll unless he dies or moves away (or, presumably, is convicted of a felony). New names are added to the old roll. Almost all of the work of the commission is devoted to securing names of persons suggested for consideration as new jurors. The clerk performs some duties directed toward securing such names. This is a part-time task, done without compensation, in spare time available from performance of her duties as clerk of the Circuit Court. She uses voter lists but not the tax assessor's lists. Telephone directories for some of the communities are referred to, city directories not at all since Greene County is largely rural.

The clerk goes into each of the eleven beats or precincts annually, usually one time. Her trips out into the county for this purpose never consume a full day. At various places in the county she talks with persons she knows and secures suggested names. She is acquainted with a good many Negroes, but very few "out in the county." She does not know the reputation of most of the Negroes in the county. Because of her duties as clerk of the Circuit Court the names and reputations of Negroes most familiar to her are those who have been convicted of crime or have been "in trouble." She does not know any Negro ministers, does not seek names from any Negro or white churches or fraternal organizations. She obtains some names from the county's Negro deputy sheriff.

The commission members also secure some names, but on a basis no more regular or formalized than the efforts of the clerk. The commissioners "ask around," each usually in the area of the county where he resides, and secure a few names, chiefly from white persons.[6] Some of the names are obtained from public officials, substantially all of whom are white.

One commissioner testified that he asked for names and that if people didn't give him names he could not submit them.[7] He accepts pay for one day's work each year, stating that he does not have a lot of time to put on jury commission work. The same commissioner considered that Negroes are best able to judge which Negroes are good and outstanding citizens and best qualified for

---

6. The commissioner who concentrates on four precincts in the south of the county could not say that he visited each of those precincts in the year August 1965–August 1966. The commissioner who had been concentrating on the northern precincts had been ill in August 1966, and his participation in affairs of the commission around that time is acknowledged to have been nominal.

7. A portion of his testimony was as follows:
 Q. And these are the four precincts you provided names for?
 A. That I sort of worked around.
 Q. Am I also correct you could not find any list that you submitted to the jury commission?
 A. I couldn't find them when they wouldn't submit them to me.
 Q. Pardon?
 A. They were not submitted; there was no way for me to find them; I asked for them, and that is all I could do; if they don't send them, I can't submit them.

jury service, that the best place to get information about the Negro citizen is from Negroes. He takes the word of those who recommend people, checks no further and sees no need to check further, considering that he is to rely on the judgment of others.[7-A] He makes no inquiry or determination whether persons suggested can read or write, although § 21 excludes persons who cannot read English. Neither commissioners nor clerk have any social contacts with Negroes or belong to any of the same organizations.

Through its yearly meeting in August, 1966, the jury commission met once each year usually for one day, sometimes for two, to prepare a new roll.[8] New names presented by clerk and commissioners, and some sent in by letter, were considered. The clerk checked them against court records of felony convictions. New names decided upon as acceptable were added to the old roll. The names of those on the old roll who had died or moved away were removed.

At the August, 1966 meeting one commissioner was new and submitted no names, white or Negro, and merely did clerical work at the meeting. Another had been ill and able to seek names little if at all. The third could remember one Negro name that he suggested. This commissioner brought the name, or names, he proposed on a trade bill he had received, and after so using it threw it away. All lists of suggested names were destroyed. As a result of that meeting the number of Negro names on the jury roll increased by 37. (Approximately 39 were added but it is estimated that two were lost by death or removal outside the country.) Approximately 32 of those names came from lists given the clerk or commissioners by others.

The testimony is that at the one-day August meeting the entire voter list was scanned. It contained the names of around 2,000 Negroes.

Thus in practice, through the August, 1966 meeting the system operated exactly in reverse from what the state statutes contemplate. It produced a small group of individually selected or recommended names for consideration. Those potentially qualified but whose names were never focused upon were given no consideration. Those who prepared the roll and administered the system were white and with limited means of contact with the Negro community. Though they recognized that the most pertinent information as to which Negroes do, and which do not, meet the statutory qualifications comes from Negroes there was no meaningful procedure by which Negro names were fed into the machinery for consideration or effectual means of communication by which the knowledge possessed by the Negro community was utilized. In practice most of the work of the commission has been devoted to the function of securing names to be considered. Once a name has come up for consideration it usually has been added to the rolls unless that person has been convicted of a felony. The function of appling the statutory criteria has been carried out only in part, or by accepting as conclusive the judgment of others, and for some criteria not at all.

Testimony that most of the emigration out of the county is by younger and better educated Negoes, tending to leave in the county those older and illiterate, proves little in the overall picture. In late 1966 there were at least an estimated 2,000 Negroes on the voting rolls.[9] The minimum voting age in Alabama is 21. It cannot be presumed that all of

7-A. The clerk testified that if one recommending another for jury duty did not know the reputation of the person recommended there was no way for her to find it out.

8. An annual meeting is required to be held between August 1 and December 20. Tit. 30, § 20.

9. Between November 8, 1965 and August 16, 1966 federal voting registrars registered approximately 1800 to 1900 Negroes as voters in Greene County.

these adults, or anywhere near all, were over age 65, which in any event is a basis for excuse and not exclusion, or were unable to read English and not freeholders. (In any event it appears that the requirement of ability to read English has been the subject of little inquiry.)

▮ The grand jury panel which met and would have considered the charges against Bokulich had it not been enjoined consisted of ten whites and eight Negroes. The racial composition of a single drawn jury panel cannot cure the disparity on the roll or the deficient system by which the roll is set up and maintained.

In January, 1967, after this suit was filed, an extraordinary session of the jury commission was held. Part of its work was to add females to the jury list, as a result of the September, 1966, amendments by the Alabama legislature extending jury service to women. The procedure for obtaining names to be added to the list, including the names of Negroes, was the same as that previously employed. There is evidence that more persons, including more Negroes, were asked for suggestions than in the past, but the system remained the same.[10]

3.

We turn to consideration of the statistical results produced by the operation of the system.

### 1960 CENSUS, GREENE COUNTY, PERSONS OVER 21 YEARS OF AGE

| | White | % White | Negro | % Negro |
|---|---|---|---|---|
| Male | 775 | 26% | 2247 | 74% |
| Female | 874 | 24% | 2754 | 76% |
| Total | 1649 | | 5001 | |

### COMPOSITION OF JURY ROLLS, 1961–66 (MALES ONLY)

| Year | White males on Jury Rolls | % of 1960 Pop. (white males) | Negro males on Jury Rolls | % of 1960 Pop. (Negro males) |
|---|---|---|---|---|
| 1961 | 337 | 43% | 16 | .7% |
| 1962 | 348 | 45% | 26 | 1% |
| 1963 | 349 | 45% | 28 | 1% |
| 1964 | – | | – | |
| 1965 | 382 | 49% | 47 | 2% |
| 1966 | 389 | 50% | 82 | 4% |

The January, 1967 meeting of the jury commission increased the number of whites and Negroes, a substantial part of the increase coming from inclusion of females for the first time. Whites on the roll increased to 810, which was 49%

10. "[T]he mere change in state law, whose previous commands had already been consciously ignored, did not remove the central issue of the pattern and practice of racial discrimination. The change of merely one of the sources or tools of the conduct did not demonstrate a change in the conduct itself." Pullum v. Greene, 396 F.2d 251, 254 (5th Cir. 1968).

of the 1960 census figure for adult white males and females. Negroes on the roll increased to 388, which was 7½% of the 1960 census figure for adult Negro males and females. There was testimony that by 1967, through migration of Negroes, the population ratio for all Negroes and all whites had decreased to 65%–35%. Assuming that this change was reflected in the numbers of adults as in non-adults, and that the number of adult whites remained approximately constant, then the approximate number of adult Negroes in the county (male and female) had declined from 5001 to 3065, of whom approximately 12½% were on the rolls in 1967 after the January special meeting. Recognizing the assumptions and approximations involved that prevent exact figures, the disparity is nevertheless evident, for at the same time approximately half of the adult whites (male and female) were on the rolls, a continuation of the previous practice of maintaining on the roll approximately half of the eligible white population.

In 1961 the jury roll was 95% white, 5% Negro. Before the extraordinary session of January 1967 it had become 81% white, 19% Negro. After the extraordinary session it was 68% white, 32% Negro. This is to be contrasted with the estimate of population at that time of 65% Negro and 35% white.

4.

■ The discriminatory administration of jury selection laws fair on their face achieving a result of exclusion of Negroes from juries has been a violation of the Fourteenth Amendment for almost 100 years. Neal v. Delaware,

103 U.S. 370, 26 L.Ed. 567 (1881). Discrimination in the selection of grand juries has been the basis for reversal of state criminal convictions since 1883. Bush v. Kentucky, 107 U.S. 110, 1 S.Ct. 625, 27 L.Ed. 354 (1883).

It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community. For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government. We must consider this record in the light of these important principles. The fact that the written words of a state's laws hold out a promise that no such discrimination will be practiced is not enough. The Fourteenth Amendment requires that equal protection to all must be given— not merely promised.

Smith v. Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84, 86 (1940).

■ The Constitution does not require representation of a litigant's race on the jury panel which tries his case, Bush v. Kentucky, *supra*. It does not demand that the jury roll or venire be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). It does require that there be no systematic exclusion of Negroes on account of race from participation as jurors in the administration of justice.[11]

11. Discrimination against Negroes is not the only factor producing imbalances in jury selection which may be unconstitutional. Prior to its recent amendment the provisions of Tit. 30, § 21, quoted supra, denying women the right to serve on juries, was held unconstitutional. White v. Crook, supra. Exclusion of persons of identifiable national origin (Mexican-Americans) has been struck down. Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). Maryland has held invalid discrimination on religious grounds. Schowgurow v. State, 240 Md. 121, 213 A.2d 475 (1965). Those of low economic status have been kept off the rolls. *E.g.*, Labat v. Bennett, *supra*. California has disciplined a prosecuting attorney who assisted the jury commissioner in eliminating defense-prone jurors from the jury rolls. Noland v. State Bar of California, 63 Cal.2d 298, 46 Cal.Rptr. 305, 405 P.2d 129 (1965).

The statistical results produced by the system employed in Greene County, and the testimony of those who administer the system, establish that there is invalid exclusion of Negroes on a racially discriminatory basis. The *modus operandi* of the selection system, as described by those in charge of it, rather than satisfactorily explaining disparities reaffirms what the figures show, that there has been followed "a course of conduct which results in discrimination 'in the selection of jurors on racial grounds.'"[12] Davis v. Davis, 361 F.2d 770 (5th Cir. 1966); United States ex rel. Seals v. Wiman, 304 F.2d 53 (5th Cir. 1962); White v. Crook, *supra*.

██ The Constitution casts upon jury commissioners, as judicial administrators, affirmative duties which must be carried out in order to have a constitutionally secure system.

– Cassell v. Texas, 339 U.S. 282, at 289, 70 S.Ct. 629, at 633, 94 L.Ed. 839, at 848. "When the commissioners were appointed as judicial administrative officials, it was their duty to familiarize themselves fairly with the qualifications of the eligible jurors of the county without regard to race and color. They did not do so here, and the result has been racial discrimination. We repeat the recent statement of Chief Justice Stone in Hill v. Texas, 316 U.S. 400, 404, 62 S.Ct. 1159, 1161, 86 L.Ed. 1559, 1562:

'Discrimination can arise from the action of commissioners who exclude all negroes whom they do not know to be qualified and who neither know nor seek to learn whether there are in fact any qualified to serve. In such a case discrimination necessarily results where there are qualified negroes available for jury service.'"

– Avery v. Georgia, 345 U.S. 559, 561, 73 S.Ct. 891, 892, 97 L.Ed. 1244, 1247 (1953): "The Jury Commissioners, and the other officials responsible for the selection of this panel, were under a constitutional duty to follow a procedure

—'a course of conduct'—which would not 'operate to discriminate in the selection of jurors on racial grounds.' Hill v. Texas, 316 U.S. 400, 404, 62 S.Ct. 1159 [1161], 86 L.Ed. 1559, 1562 (1942). If they failed in that duty, then this conviction must be reversed—no matter how strong the evidence of petitioner's guilt."

– United States ex rel. Seals v. Wiman, *supra*, 304 F.2d at 65 (5th Cir. 1962): "Those same cases, however, and others, recognize a positive, affirmative duty on the part of the jury commissioners and other state officials * * *."

Conscious or intentional failure of jury commissioners to carry out their duties, or evil motive, or lack of good faith, is not necessary for a system to be unconstitutional in its operation.

– Vanleeward v. Rutledge, 369 F.2d 584, 586 (5th Cir. 1966). "It is not necessary to determine that any of the commissioners, consciously or intentionally, failed to carry out the duties of their office, to conclude that the jury list from which the panel that tried Vanleeward was selected was totally defective."

– United States ex rel. Seals v. Wiman, *supra*, 304 F.2d at 65. "[I]t is not necessary to go so far as to establish ill will, evil motive, or absence of good faith, but that objective results are largely to be relied on in the application of the constitutional test."

The consequences of the discrimination resulting from failure to seek out and become acquainted with the qualifications of Negroes were described in Smith v. Texas, *supra*, 311 U.S. at 132, 61 S.Ct. at 166, 85 L.Ed. at 87. "Where jury commissioners limit those from whom grand juries are selected to their own personal acquaintance, discrimination can arise from commissioners who know no negroes as well as from commissioners who know but eliminate them. If there has been discrimination, whether accomplished ingeniously or ingenuously, the conviction cannot stand."

12. Akins v. Texas, 325 U.S. 398, 403, 65 S.Ct. 1276, 1279, 89 L.Ed. 1692, 1696 (1945).

■ Alabama is among the most enlightened of the states in requiring that broadly inclusive community lists be consulted and that all eligible persons be shown on the rolls.[13] The purpose of the Alabama system is to insure that the jury roll is a cross-section of the community. White v. Crook, *supra*; Mitchell v. Johnson, *supra*. Compliance with selection procedures set by a state legislature does not necessarily meet constitutional standards. But if a jury selection system as provided by the Alabama statutes is fairly and efficiently administered, without discrimination and in substantial compliance with the state statutes—which the state courts of Alabama already require—the odds are very high that it will produce a constitutional result of a jury fairly representative of the community. Failure to comply with state procedures does not necessarily produce an unconstitutional exclusion. But the fact of, and the extent of, the failure in this case to comply with the procedures and the results contemplated by the Alabama system is strong evidence of unconstitutionality.

■ The selection procedures are not validated by the fact that traditionally the system always has been that way, or that the clerk and the commissioners are in effect persons who as a public service contribute their time and effort, or that funds are not provided for the commission to operate in the manner directed by the state statutes and required by constitutional standards.

■ We hold that Negro citizens of Greene County are discriminatorily excluded from consideration for jury service, in violation of the equal protection clause of the Fourteenth Amendment, and that Tit. 30, § 21 has been unconstitutionally applied as to them. We hold also that the discriminatory exclusion of Negroes is, as to the plaintiffs Bokulich,

Brown and Greene, a violation of both equal protection and due process.

### 5.

The attack on racial composition of the commission fails for want of proof. No proof was adduced except that the commission in Greene County now is and for many years has been composed entirely of white men appointed by the governor.[14]

■ The statutory criteria in § 21 of good character, honesty, intelligence, integrity, sound judgment and sobriety are attacked as facially unconstitutional for vagueness. Many states join Alabama in some of these requirements and in excluding convicted felons.[15] The Supreme Court has not held criteria such as these void for vagueness in the selection of jurors. And it has recognized the validity of wide discretion in jury commissioners. Cassell v. Texas, *supra*; Franklin v. South Carolina, 218 U.S. 161, 30 S.Ct. 640, 54 L.Ed. 980 (1910). We decline to hold § 21 unconstitutional on its face.

■ Sec. 4, providing, "Any person who appears to the court to be unfit to serve on the jury, may be excused on his own motion, or at the instance of either party," also is alleged to be unconstitutional on its face. No reason, argument or authority is advanced in support of this allegation, and we decline to hold it facially unconstitutional.

■ The prayer that prosecutors in exercise of peremptory challenges be required not to reject jurors on account of race is denied. Swain v. Alabama, *supra*.

### 6. Relief.

■ The plaintiff Head and the class which he represents are entitled to an injunction against discriminatory exclusion of Negroes from consideration for jury service in Greene County. In

---

13. *See* Note, The Congress, The Courts and Jury Selection: A Critique of Titles I and II of the Civil Rights Bill of 1966, 52 Va.L.Rev. 1069, 1079 n. 54 (1966).

14. Cf. Clay v. United States, 5 Cir., F.2d [No. 24,991, May 6, 1968].

15. *See* Note, *supra* note 13, at 1073–74 n. 25–28.

Coleman v. Barton, *supra*, in 1964 the single district judge stayed his hand and entered only a declaratory judgment. His abstention from granting injunctive relief was based in part on the fact that the general relief sought of him by Coleman as one of the plaintiffs encompassed the specific relief contemporaneously sought by Coleman in state courts and the state courts should not be interfered with in their determination. In the judgment in that case the judge expressly left the door open for future injunctive relief, i. e., "[R]elief by way of injunction be and the same is hereby denied, but without prejudice as to future injunctive relief by further application herein or in any other proceedings." The declaration of rights and duties then made had not, as of January, 1967 produced a jury roll or a jury selection system meeting constitutional standards or purporting in real substance to carry out the mandate of the Alabama legislature. Coleman's litigation is now at an end. The plaintiffs in this case include Head as representative of the same general class as the plaintiffs other than Coleman in Coleman v. Barton. There is no occasion for further withholding of injunctive relief that will run to, the benefit of other plaintiffs in Coleman v. Barton and in this case, and to which they are entitled.

■ The normal and most appropriate method for Bokulich, Brown and Greene to raise the composition of the jury roll and the operation of the jury selection system is in criminal prosecutions in the state courts, if indictments issue. Stefanelli v. Minard, 342 U.S. 117, 123, 72 S.Ct. 118, 121, 96 L.Ed. 138, 144 (1951); Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943). Their requests for injunctive relief will be denied.

The motion of the defendants to dismiss and the objections to the intervention by Brown and George Greene are to be overruled and denied. Dismissal on the merits will be entered as to all defendants other than the members and the clerk of the jury commission.

The attention of the defendants is directed to Mitchell v. Johnson, 250 F.Supp. 117 (M.D.Ala.1966), and to the recently decided case of Turner v. Fouché et al., 290 F.Supp. 648 (S.D.Ga.1968). In *Mitchell* the jury commissioners of Macon County, Alabama, were directed to abandon the jury roll, and to compile a new jury roll in strict accordance with the law of Alabama and the applicable constitutional principles. The court pointed out the necessity of the clerk's compiling the master list directed by § 18 and of the commission's employing the sources of information which the Alabama statutes direct be employed, so as to compile on an objective basis a list as complete as possible, and then to apply thereto the subjective standards of § 21—good character, sound judgment, ability to read English, etc.—fairly and objectively to all in a nondiscriminatory manner and without regard to race.

In *Turner* the jury commissioners of Taliaferro County, Georgia, a predominantly rural county comparable to Greene County, were informed by the court that the jury was illegally constituted because of exclusion of Negroes. Without the necessity of further orders of the court the county officials recomposed the jury list and reported to the court the results. The jury commissioners gave separate consideration to the name of every potentially eligible juror. If they lacked information about a particular individual they made inquiry in the community. Inquiries about Negroes were made of Negroes. Responsible Negroes were called upon to assist, and did assist, the jury commissioners. Specific eliminations were made based on poor health, citizens who were away from the county most of the time, persons requesting that they not be considered, persons about whom no information was available, and persons rejected as not conforming to the statutory standards of being intelligent and upright citizens. A Negro was appointed as clerk to the commission until such time as a Negro or Negroes could be appointed to membership.

Attention also is directed to the personal survey method employed by the jury board of Jefferson County, Alabama. Billingsley v. Clayton, 359 F.2d 13 (5th Cir. 1966).

Judgment will be entered in accordance with this opinion.