Annie Lee **WHITFIELD** et al., Plaintiffs,

v.

**Julia J. OLIVER** et al., Defendants.

Civ. A. No. 3330–N.

United States District Court, M. D. Alabama, N. D.

Aug. 1, 1975.

Frank P. Samford, III, Tuscaloosa, Ala., and William M. Dawson, Jr., Judith S. Segal and Stan Downey, Jr., Birmingham, Ala., for plaintiffs.

William J. Baxley, Atty. Gen. of Ala., and Mary Lee Stapp and Clyde P. McLendon, Asst. Attys. Gen. of Ala., for defendants.

Before GODBOLD, Circuit Judge, and JOHNSON and VARNER, District Judges.

GODBOLD, Circuit Judge:

This is our second consideration of a case brought by Negro plaintiffs who claim that the Department of Pensions & Security of the State of Alabama has practiced racial discrimination in its administration of "categorical assistance programs." In our previous decision, *Whitfield v. King,* 364 F.Supp. 1296 (M.D.Ala., 1973), we implemented the decision that the Supreme Court of the United States had handed down in *Jefferson v. Hackney,* 406 U.S. 535, 92 S. Ct. 1724, 32 L.Ed.2d 285 (1973). We are now required to reexamine the case before us on the single constitutional issue of whether the Department of Pensions & Security has violated the equal protection clause of the United States Constitution.

This suit can best be understood by quoting from our earlier opinion:

These [categorical assistance] programs are established by federal law and financed to a great extent with federal funds but administered by the states in what has been termed "a scheme of cooperative federalism." *King v. Smith,* 392 U.S. 309, 316, 88 S.Ct. 2128, 20 L.Ed.2d 1118, 1125

(1968). They provide financial assistance and rehabilitation services to needy persons who are disabled by physical impairments or old age or youth. The four programs are Aid to Needy Families with Dependent Children,[1] Aid for the Permanently

1. 42 U.S.C. § 601 et seq.

and Totally Disabled,[2] Old Age

2. 42 U.S.C. § 1351 et seq.

Assistance[3] and Aid to the Blind.[4]

3. 42 U.S.C. § 301 et seq.
4. 42 U.S.C. § 1201 et seq.

The plaintiffs represent classes of Negro citizens residing in the State of Alabama and receiving benefits under the Dependent Children . . . program . . . who claim that because of their race they have lost their benefits or receive lower benefits.

\* \* \* \* \* \*

To precisely understand plaintiffs' contentions requires examination of the methods by which benefits are calculated for the four categorical assistance programs. First, the Department must compute a "standard of need" composed of various essential living expenses[9] which are common to

9. Such as food, clothing, shelter, household supplies, medical supplies.

all recipients regardless of program categories. If the pool of available funds is insufficient to bring all recipients up to the standard of need the state may adjust downward the level of benefits it will pay by means of a reduction factor or factors. The reduction factor is simply a means by which the state can adjust need figures downward to a benefit level which its fiscal capacities can meet. The federal statutes do not require that the same reduction factor be employed for all programs, and the valid-

ity of this arrangement has been sustained in numerous cases.

\* \* \* \* \* \*

364 F.Supp. at 1297-98.

One of the claims of plaintiffs is that there is wide disparity in allocation and payment of funds to beneficiaries of the Aid to Needy Families with Dependent Children program [AFDC], where the majority of recipients are black, and allocation and payment to beneficiaries of the Old Age Assistance program [OA], where the majority of recipients are white. The disparity occurs, plaintiffs say, because the Department uses widely different reduction factors for the AFDC and OA programs. The difference in reduction factors results from both the state legislature's decision to specifically allocate more money to OA than to AFDC and the Department's decisions concerning which program shall receive funds not legislatively "earmarked." When the respective reduction factors are applied to the respective programs the benefits to AFDC recipients are "scaled down" so that each recipient is paid only a fraction of his standard of need (when this case was submitted for decision, 55%), while the benefits to OA recipients are "scaled down" to a lesser degree (or not at all) so that each OA recipient receives a larger percentage of his standard of need (under current practice 100% of standard of need). Plaintiffs assert that this practice violates the equal protection clause of the United States Constitution.

*Jefferson* arose from the State of Texas. The decision of the Supreme Court in that case controlled several of the issues raised in the present litigation, and on those issues we ruled adversely to plaintiffs in our prior decision. *Jefferson* also necessitated our giving further consideration to plaintiffs' claim of violation of the equal protection clause based upon the disparate reduction factors.

In *Jefferson* the Supreme Court addressed an equal protection argument essentially identical to the one presented by the plaintiffs in the present case. The Texas plaintiffs contended that it was "arbitrary and discriminatory to provide only 75% of [the] standard [of need] to AFDC recipients, while paying 100% of recognized need to the aged, and 95% to the disabled and the blind." The Court responded to this argument by emphasizing the independence of the four programs and concluded that "[s]o long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and needy are not subject to a constitutional straitjacket." 406 U.S. at 546, 92 S.Ct. at 1731, 32 L.Ed.2d at 296.

The plaintiffs in *Jefferson* had alleged that there was racially discriminatory purpose and effect in the allocations of funds between the various assistance programs in Texas. With respect to the charge that there was racially invidious purpose in setting disparate reduction factors, the District Court found, and the Supreme Court affirmed, that the plaintiffs had failed to prove that there was an invidious purpose. With respect to the claim of discriminatory effect, the Court concluded that although "there is a larger percentage of Negroes and Mexican-Americans in AFDC than in the other programs," this "naked statistical argument," with no showing of discriminatory purpose, was insufficient to justify the application of the "strict" standard of review which the courts in some circumstances apply when considering whether state action violates the equal protection clause. That standard, where applicable, requires that the state demonstrate a "compelling state interest" to justify differing treatment of distinct classes of persons. See, *e. g.*, *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Skinner v. Oklahoma*, 316 U.S. 535, 62

S.Ct. 1110, 86 L.Ed. 1655 (1942). Since in *Jefferson* the proof was not sufficient to trigger the "strict" standard of review, the Court applied instead the less rigorous "traditional" standard of review which requires that the state need only demonstrate that differing treatment of distinct classes of persons bears some rational relationship to a legitimate state end. See *McDonald v. Board of Election Com'rs of Chicago*, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969); *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed. 2d 797 (1974). The Court concluded that the State of Texas had met this rational relationship standard, with the result that there was no violation of equal protection.

In the present case, complying with the Supreme Court's analysis of the issues in *Jefferson*, we permitted the plaintiffs an opportunity to develop and present, if they could, further evidence on the equal protection issue arising from the disparate reduction factors in Alabama. That evidence, in the form of voluminous depositions and a mass of documentary data, has been submitted and the parties have filed briefs. We conclude that the evidence does demonstrate both discriminatory purpose and effect. Having reached this conclusion, we must then review the Department's allocation of funds under the "strict" or "compelling state interest" standard. We find that the state has not demonstrated any compelling state interest justifying the disparity in allocation and payment of benefits that exists between the predominantly black AFDC program and the predominantly white OA program. The result is that the state's differing treatment of the two programs violates the equal protection of the laws that the Fourteenth Amendment to our Constitution guarantees.

As in *Jefferson*, discriminatory effect is shown by statistical data. In recent years AFDC has been composed of approximately 75% black recipients

while OA has been composed of approximately 41%.[1]

| | AFDC | | OA | |
| | White | Negro | White | Negro |
|---|---|---|---|---|
| June 1963 | 35.9 | 63.9 | 59.9 | 40.0 |
| June 1964 | 33.7 | 66.0 | 59.9 | 40.0 |
| June 1965 | 35.4 | 64.3 | 59.7 | 40.2 |
| June 1966 | 33.6 | 66.1 | 59.7 | 40.2 |
| June 1967 | 31.6 | 68.1 | 59.4 | 40.5 |
| June 1968 | 26.5 | 73.2 | 58.8 | 41.1 |
| June 1969 | 23.6 | 76.2 | 58.6 | 41.3 |
| June 1970 | 23.9 | 75.9 | 58.9 | 41.0 |
| Dec. 1971 | 23.9 | 75.9 | | |

In fact, for more than 20 years AFDC has consistently been a predominantly black program.

Bearing in mind the racial composition of the two programs, the ultimate disparity in benefits is patent. For example, in the ten-year period 1951–61 an AFDC recipient never received more than 50% of his standard of need while an OA recipient never received less than 57%. AFDC recipients in that period generally received from 25% to 45% of their standard of need while OA recipients generally received from 70% to 90%. Statistics available indicate that OA recipients since 1962 have received substantially all of their standard of need (the current figure is 100%) while AFDC recipients have never received more than 55%. Applying the lower reduction factor (now 55%) to AFDC while paying 100% of need to OA has a discriminatory impact upon black recipients of Departmental funds.

This disparity in the treatment of the two programs in recent years is made particularly clear by comparing Alabama's average benefit payments with those of other states. In March 1971 Alabama paid $70.20 per OA recipient. This figure was only slightly below the nation-

al average of $76.95 and was above the median for the states. By contrast, in the same month Alabama paid $15.15 per AFDC individual recipient and $59.35 per family. These figures were less than one-third of the national averages of $49.60 and $186.50 and were the second lowest figures among the states. Figures for March 1971 show that Alabama was the only state paying lower AFDC benefits *per family* than OA benefits *per individual*. Alabama's exceptional pattern is also demonstrated by figures for June 1972 which show that Alabama was spending $2.95 on OA for every $1.00 on AFDC. No other state had a ratio of as much as two to one.

Next we consider the proof of racially discriminatory purpose, the evidentiary element that was missing in *Jefferson*. Several factors combine to cause us to conclude that a racially-based discriminatory intent existed.

First, there is a striking correlation between the increasing percentage of black participants in the AFDC program and the increasingly preferential treatment accorded to OA recipients. In 1948 AFDC was composed of approximately 37% black families. By 1963 it had become a predominantly black program (approximately 64%). During this time the racial percentages in OA appear to have remained approximately stable, 55%–60% white, 45%–40% black. In 1948 when AFDC was heavily white (approximately 63%) the average AFDC payment was $32 and the average OA payment was $19. By 1963, at which time AFDC was approaching two-for-one black, the average AFDC payment had increased 47% to approximately $47. By contrast the average OA payment had increased 258% to $68.[2]

---

1. As used in this discussion, "recipient" refers to a case, which may consist of one or more individuals. In the 20-year period 1952–72 the average OA "recipient" consisted of 1.02 persons. In the same period the average AFDC "recipient" consisted of 4.10 persons.

2. These figures are payments to a "recipient." *See* footnote 1, *supra*, as to what a recipient is in each program.

Average OA payments have continued to remain higher than AFDC payments since 1963.

One of the subsidiary facts referred to in *Jefferson* as tending to show an absence of racial prejudice was that from 1943 to 1969 overall appropriations for OA had increased 211% as against 410%, or almost twice the OA increase, for AFDC. No such inference of lack of prejudice can be drawn in this

Second, throughout the history of the programs in Alabama, state officials have been aware of their racial composition. Documents submitted to us indicate that racial breakdowns of AFDC were undertaken in 1941, 1948, 1953, 1956, 1958, 1960, 1961, 1963, and all years subsequent to 1963. Inquiries concerning racial composition of AFDC have been received with some frequency from Alabama legislators. This kind of information, available to legislators and administrators for use in decision making, was not shown to be available to the Texas officials in *Jefferson*.[3]

The third factor contributing to a finding of discriminatory intent, and perhaps the most striking evidence in this case, is the testimony of Ruben King who served as Commissioner of the Department of Pensions and Security from 1963 until 1974. King noted that legislators had been critical of AFDC on the grounds that it was predominantly a program for Negroes and that a large number of illegitimate children were subsidized by it:

Q All right. What were the specific criticisms that you felt were most important about the Aid to Dependent Children program?

A Well, I think that the specific criticisms were that, first of all, most people had the idea that all of the children were illegitimate where, I think, the study showed approximately twenty-six percent. Another thing is that most of the people in this state and, I think, throughout the country think that most of the people on ADC are colored.

Q And in Alabama they were, of course?

A I think it showed—I've forgotten what it showed, but I think it showed approximately sixty percent, something like that.

Q Had you heard criticism of the fact that Aid to Dependent Children was predominantly a program for Negroes and that a large number of illegitimate children were subsidized by it?

A Sure. This is one of the reasons why I wanted the study made. I wanted to know exactly what the true facts were.

Q And did some of this criticism come from members of the Legislature?

A Right.

King then went on to elaborate on the nature and effect of this criticism:

A . . . I've heard hundreds criticize it [AFDC].

Q And were some of those people legislators?

A Some were legislators, some were bankers, and some were preachers.

Q And was one of the bases of criticism that the program was monumentally a black program, a program for Negroes?

A I don't know that I ever made that specific statement, but I think that that is the general public's attitude, yes.

Q In your statement with regard to your dealing with the Legislature and with the Board, would it be fair to say that the reason you did not try to utilize any un-earmarked funds on Aid to Dependent Children was that you felt that there would simply be too

case. From 1942 to 1972 the state's contributions to the programs increased 3115% for OA against 2855% for AFDC, and funding from all sources increased 4071% for OA against 3306% for AFDC.

3. In *Jefferson* the Supreme Court appeared to consider the unavailability of such data to be a factor negating the existence of racial discriminatory intent. Such an inference—of

absence of discriminatory purpose—cannot be drawn in this case, where information on racial composition has been available. Alabama officials contend that in later years the statistical studies of racial composition were required by HEW. But the motive of the state in compiling the data does not eliminate the evidentiary effect of its availability as a factor in decision making.

great a public reaction to cutting benefits even a small amount?

A  I think it would have destroyed the program.  I think there would have been no program because there's nothing in the law which said that you have to have an Aid to Dependent Children program period.  That program could have been completely eliminated.

Q  So, you felt—

A  And it probably would have been too.

Q  So, you felt that it was better to have smaller benefits than to take a chance on hurting the program politically as a whole?

A  That's correct.

The message is plain—the highest official of the Department recognized that AFDC benefits had to be smaller because AFDC was considered to be a program for Negroes, and that using unearmarked funds for AFDC rather than for OA would result in legislative abolition of AFDC.  Coupled with this recognition that AFDC payments must not be made larger at the expense of OA, was recognition by the Commissioner that in absolute dollar terms the AFDC payments were so small as to be ridiculous, and in human terms the comparative treatment of AFDC and OA recipients was indefensible.  This was his testimony:

Q  And did you feel that [the percentage applicable to AFDC] was too small?

A  Sure I did.  I went all over this state to civic clubs speaking about the fact that the [AFDC] payments were what I considered to be ridiculous, and I remember making a statement that here we were paying pensioners [OA] a hundred percent and that we were meeting some people on the streets that were hungry and we were filling the plates of the pensioners and

we were only giving the children a third.

Another previous head of the Department [then called the Director], Bryant Whitmire, expressed himself equally as firmly:

I don't think that they [the programs] all had to have the same amount, but there should be some fair proportion, and when they started cutting the children and the rest of the categories down, the handicapped and so forth, at their expense and putting it on Old Age, I thought it was tragic.

The fourth factor is the previous record of the Department with respect to racial matters.  The Supreme Court in 1968 held that Alabama's "substitute father" regulation [4] conflicted with the AFDC provisions of the Social Security Act.  *King v. Smith*, 392 U.S. 309, 88 S. Ct. 2128, 20 L.Ed.2d 1118 (1968).  Although neither the Supreme Court nor the three-judge district court relied on racial discrimination as the ground for decision, the three-judge court did explicitly note the existence of "facts strongly indicating that the 'substitute father' regulation was designed to discriminate and has the effect of discriminating against Negroes."  *Smith v. King*, 277 F.Supp. 31, 37 n. 7 (M.D.Ala., 1967).

Discrimination by the Department was directly at issue in *United States by Mitchell v. Frazer*, 317 F.Supp. 1079 (M.D.Ala., 1970).  The United States in that case sought to enforce "the requirement of federal statutes and regulations that State personnel who are engaged in the administration of federally financed grant-in-aid programs be recruited, hired and promoted or demoted on a merit basis, without discrimination on the ground of race or color."  317 F. Supp. at 1081.  The District Court concluded that "the Alabama Department of Pensions and Security . . . [has]

---

4.  The regulation denied AFDC payments "to the children of a mother who 'cohabits' in or outside her home with any single or married man."  *King v. Smith*, 392 U.S. 309, 311, 88 S.Ct. 2128, 2130, 20 L.Ed.2d 1118, 1122 (1968).

engaged in selection and appointment practices based solely upon race or color, not upon merit," 317 F.Supp. at 1088, and granted extensive injunctive relief. The discriminatory employment practices of the Department and the suspect motivation concerning the "substitute father" regulation further support a finding that a discriminatory purpose underlies the Department's treatment of the predominately black AFDC program.

The fifth, and final, factor is that none of the numerous past and present officials and employees of the Department who testified in this case has given an adequate explanation for the disparities between the two programs. The quoted testimony of King and Whitmire lays bare their sharp dissatisfaction with the disparities. One explanation offered by the state is that the economics of living in groups accounted for a lower reduction factor for AFDC than in OA, where recipients are more isolated. This was, however, advanced in conclusory terms, unsupported by factual data. In any event, this factor would appear to have been considered in setting the standard of need in the first place. Regulations provide for smaller maximum payments for additional children beyond the first eligible child in a family receiving AFDC benefits. To use family size as an unspoken consideration for reducing ultimate benefits through lowering the reduction factor would be counter to the regulatory scheme of permitting additional increments for additional children.

Several witnesses testified that OA was treated preferentially because old age recipients could vote and were well organized in communicating their desires to the legislature. If this were a political consideration divorced from race we would give more weight to it. But it is inextricably entangled with the politics of race. We cannot ignore that this asserted justification pits the politi-

cal clout of an organized and predominantly white group against the lesser (or non-existent) political force of an unorganized and predominantly black group. The explanation of "just politics" cannot be divorced from the historical fact of exclusion of blacks from the very political process whose operation is advanced as an explanation for the state's actions. For substantially all of the period covered by the statistical data to which we have referred the Alabama legislature was an all-white institution. From 1948 to January 1971 no Negro served in that body. In January 1971 two Negroes were seated.[5]

The history of the efforts of Negroes in Alabama to become full and free participants in the political processes of the state is recorded at length in the decisions of the federal courts. We summarize a part of it here only because it goes to the heart of the state's theory that the disparity evidenced in this case is satisfactorily explained on the basis that it is a by-product of the state's political system. In a long line of cases federal courts have found that various voter registration laws of Alabama were enacted for the purpose of withholding the franchise from Negroes and that state officials responsible for the registration of voters have discriminated against black applicants. See, e. g., *Davis v. Schnell,* 81 F.Supp. 872 (S.D. Ala.), *aff'd.* 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093 (1949); *Sellers v. Wilson,* 123 F.Supp. 917 (M.D.Ala., 1954); *United States v. Alabama,* 192 F.Supp. 677 (M.D.Ala., 1961), *aff'd.* 304 F.2d 583 (CA5), *aff'd.* 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962); *United States v. Penton,* 212 F.Supp. 193 (M. D.Ala., 1962); *United States v. Cartwright,* 230 F.Supp. 873 (M.D.Ala., 1964). See also *Hadnott v. Amos,* 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336 (1969); *Sellers v. Trussell,* 253 F.Supp. 915 (M.D.Ala., 1966). Beginning

5. No readily available state records are apparent. But it is likely that these two Negroes were the first members of their race to serve as legislators since two blacks served in the legislature of 1874, almost a century earlier.

around 1959 this court issued numerous orders against racial discrimination in registration of voters. As of 1965 injunctions from this court were in effect in ten Alabama counties. The lengthy list of orders is cataloged at *Sims v. Baggett*, 247 F.Supp. 96, 108 n. 24 (M.D.Ala., 1965). We make no effort to catalog proceedings in the Northern and Southern Districts of Alabama.

Efforts to exclude blacks from the political process have also tainted the primary machinery of political parties. *Gilmore v. Greene County Democratic Party Executive Committee*, 435 F.2d 487 (CA5, 1970); *United States by Clark v. Democratic Executive Committee of Barbour County, Alabama*, 288 F. Supp. 943 (M.D.Ala., 1968); *Smith v. Paris*, 257 F.Supp. 901 (M.D.Ala., 1966), *modified* and *aff'd*. 386 F.2d 979 (CA5, 1967).

In 1960 the Supreme Court, in an Alabama case, held racial gerrymandering unconstitutional. *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed. 2d 110 (1960). Discrimination in apportionment was again struck down in *Sims v. Baggett, supra*, where this court held invalid a system of legislative reapportionment which the Alabama legislature had adopted as a result of the decision in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). One of the reasons for striking it down was that:

> [T]he Legislature intentionally aggregated predominantly Negro counties with predominantly white counties for the sole purpose of preventing the election of Negroes to House membership.

247 F.Supp. at 109. This court concluded that the reapportionment plan had the "inescapable effect of discriminating against Negroes" and that "this discrimination was what the Legislature intended."

In 1965 the Attorney General of the United States, pursuant to the Voting Rights Act, designated Alabama as a state which maintained tests or devices and certified that the appointment of federal examiners in certain Alabama counties was "necessary to enforce the guarantees of the Fifteenth Amendment." Accordingly federal voting examiners were appointed in at least four Alabama counties.[6]

In 1966 the Alabama poll tax, "born of an effort to discriminate on the basis of race or color" and having had "just that narrow effect," was held unconstitutional. *United States v. Alabama*, 252 F.Supp. 95, 100 (M.D.Ala., 1966). In that case we pointed out that from the Constitutional Convention of 1901 to 1966 the state had consistently devoted its official resources to maintaining white supremacy and a segregated society and held:

> Such a policy naturally operates to cause white public officials to carry out their duties in a manner which favors white persons, and deters Negroes from acting affirmatively to overcome the special burden imposed by this environment on their exercise of political rights.

252 F.Supp. at 101.

Discriminatory exclusion from the governmental sphere has extended beyond efforts to withhold the franchise from blacks. A long line of cases demonstrates the efforts made to prevent blacks from serving as jurors in Alabama. *Black v. Curb*, 464 F.2d 165 (CA5, 1972); *Preston v. Mandeville*, 428 F.2d 1392 (CA5, 1970); *Penn v. Eubanks*, 360 F.Supp. 699 (M.D.Ala.,

---

**6.** *See Sims v. Baggett, supra*, at 108. The Voting Rights Act of 1965 defines a "test or device" as "any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class." 42 U.S.C. § 1973b(c).

1973); *Bokulich v. Jury Commission of Greene County, Alabama,* 298 F.Supp. 181 (N.D.Ala., 1968), *aff'd.* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970); *White v. Crook,* 251 F.Supp. 401 (M.D.Ala., 1966); *Mitchell v. Johnson,* 250 F.Supp. 117 (M.D.Ala., 1966). Employment practices by agencies of the state of Alabama have also been found discriminatory. *United States by Mitchell v. Frazer, supra; Marable v. Alabama Mental Health Board,* 297 F. Supp. 291 (M.D.Ala., 1969); *NAACP v. Allen,* 340 F.Supp. 703 (M.D.Ala., 1972), aff'd. 493 F.2d 614 (CA5, 1974); *NAACP v. Dothard,* 373 F.Supp. 504 (M. D.Ala., 1974); *Strain v. Philpott,* 331 F. Supp. 836 (M.D.Ala., 1971). Furthermore, the many cases demonstrating discrimination in the educational institutions of Alabama must be considered relevant in a discussion of efforts to prevent blacks from developing a strong and effective political force. See, *e. g., Lee v. Macon County Board of Education,* 231 F.Supp. 743 (M.D.Ala., 1964); *Harris v. Crenshaw County Board of Education,* 259 F.Supp. 167 (M.D.Ala., 1966); *Franklin v. Barbour County Board of Education,* 259 F.Supp. 545 (M.D.Ala., 1966); *Lee v. Macon County Board of Education,* 267 F.Supp. 458 (M.D.Ala.), aff'd. 389 U.S. 215, 88 S.Ct. 415, 19 L. Ed.2d 422 (1967); *Alabama State Teachers Association v. Lowndes County Board of Education,* 289 F.Supp. 300 (M.D.Ala., 1968); *Adams v. Lucy,* 228 F.2d 619 (CA5, 1955), *cert. denied* 351 U.S. 931, 76 S.Ct. 790, 100 L.Ed. 1460 (1956); *Franklin v. Parker,* 223 F.Supp. 724 (M.D.Ala., 1963), *modified* 331 F. 2d 841 (CA5, 1964).[7]

This extensive and extended history of exclusion of blacks from the Alabama political and governmental system causes the explanation of the defendants—that the disparity in the treatment of welfare programs is a result of "just politics"— to be of no legal effect as an explanation. To the contrary, such an explanation, when read against the march of history, reaffirms our conclusion that there was a discriminatory purpose and effect in the treatment of AFDC. Many of the obstacles that Alabama once placed in the way of full-fledged participation by its black citizens in the political life and government of the state have been removed. We would be naive to decide this case under a pretense that those obstacles never existed.

Since the state has not demonstrated any compelling state interest justifying the disparity in allocation and payment of benefits existing between the majority-black AFDC program and the majority-white OA program, we find that the disparities in establishment and payment of benefits as between the two programs, violate the equal protection clause of the Constitution. We turn, then, to the matter of relief.

On January 1, 1974, the categorical assistance programs were substantially revised as a result of a new program entitled "Supplemental Security Income" [SSI]. 42 U.S.C. § 1381 et seq. This enactment resulted in the federal government's assuming primary responsibility for old-age assistance, aid to the blind, and aid to the permanently and totally disabled. See 1972 U.S.Code Cong. & Admin.News 4989; 1973 U.S. Code Cong. & Admin.News 3177, 3183–84. It is, therefore, ORDERED that the defendants file with this Court within 60 days, and serve upon counsel for plaintiffs, a detailed report showing that the unconstitutional disparities between the AFDC and OA programs have been eliminated as a result of this major revision in the statutory scheme and, if not

---

7. Other state practices of racial discrimination that are at least a background to the discriminatory practices in this case include racial segregation and discrimination in the Alabama penal system, *Washington v. Lee,* 263 F.Supp. 327 (M.D.Ala., 1966), *aff'd. per curiam* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed. 2d 1212 (1968) and the Alabama mental health system, *Marable v. Alabama Mental Health Board, supra.*

eliminated, a detailed plan and proposal for removing *in toto* the unconstitutional disparities.

Jurisdiction of this case is retained pending further orders of this Court.