Joyce **TAYLOR** and Willie Huntley, on behalf of themselves and all persons similarly situated, Plaintiffs,

v.

Renee **HILL**, Director, Division of Social Services, North Carolina State Department of Human Resources, et al., Defendants.

No. C–C–74–101.

United States District Court,
W. D. North Carolina,
Charlotte Division.

Heard Jan. 23, 1976.

Decided July 6, 1976.

---

Theodore Fillette, Legal Aid Society, of Mecklenburg County, Charlotte, N. C., and Richard H. Hart, California Rural Legal Assistance, San Francisco, Cal., for plaintiffs.

Rufus L. Edmisten, Atty. Gen. of North Carolina, William Woodward Webb, Asst. Atty. Gen. of North Carolina, Raleigh, N. C., and William A. Reppy, Jr., Duke University School of Law, Durham, N. C., for defendants.

Before CRAVEN, Circuit Judge, JONES, Chief District Judge, and McMILLAN, District Judge.

CRAVEN, Circuit Judge:

Aid to Families With Dependent Children ("AFDC") is a federal welfare program in which the states participate jointly with the federal government in making support grants to needy families with dependent children. *See* Title IV, Social Security Act, 42 U.S.C. § 601, *et seq.* "Medicaid" is a joint federal-state program under Title XIX of the Social Security Act, 42 U.S.C. § 1396a, providing medical care and assistance to qualified indigent families and individuals. The question presented is whether the defendants in denying these welfare benefits have deprived the plaintiffs of any rights secured by the Constitution or laws of the United States. 42 U.S.C. § 1983. We hold they have not.

I.

This litigation began in 1972 as a class action before a single-judge federal district court.[1] Both class representatives, Joyce

---

1. *Taylor, et al. v. Hill, et al.,* 377 F.Supp. 495 (W.D.N.C., Charlotte Div., filed May 9, 1974).

The defendants are Renee Hill, Director, Division of Social Services, North Carolina State

Taylor and Willie Huntley, were, at the time the action was filed, pregnant with their first child. They applied for AFDC benefits at their local county welfare office, but were informed that their applications for aid could not be considered until after their children had been born, that AFDC benefits were not available for unborn children. Since the North Carolina indigents eligible for AFDC benefits automatically qualify for Medicaid, the denial of AFDC assistance effectively rendered plaintiffs ineligible for Medicaid during the term of their pregnancies.

The original complaint alleged that plaintiffs and their class were entitled to benefits under the Social Security Act and HEW regulations, and that North Carolina's failure to process their applications violated both the statute and the equal protection clause of the fourteenth amendment to the United States Constitution. The alleged violation of the Social Security Act was tried before the single-judge court.

Plaintiffs contended that 42 U.S.C. § 606(a)[2] and a HEW regulation appearing at 45 C.F.R. § 233.90(c)(2)(ii)(1973)[3] required that otherwise qualified expectant women were eligible for AFDC benefits for their unborn children as soon as the fact of pregnancy had been medically established. The HEW regulation, promulgated in 1946,[4] extends to the states an option whether or not to provide AFDC benefits to unborn

children. States are not required to accept these federal funds, which must be supplemented by state contributions, and North Carolina is only one of many states which have declined to provide such aid.[5]

In an opinion dated June 10, 1974, Judge McMillan, relying primarily upon the Fourth Circuit decision in *Doe v. Lukhard,* 493 F.2d 54 (4th Cir. 1974), granted a preliminary injunction against enforcement of the state policy denying benefits to unborn children. The state appealed.

On March 18, 1975, the United States Supreme Court handed down its decision in *Burns v. Alcala,* 420 U.S. 575, 95 S.Ct. 1180, 43 L.Ed.2d 469 (1975). The issue, as framed by the Court, was "whether States receiving federal financial aid under the [AFDC] program . . . must offer welfare benefits to pregnant women for their unborn children." at 576, 95 S.Ct. at 1182, 43 L.Ed.2d at 473. The Court limited its inquiry strictly to the statutory requirements of § 406(a) of the Social Security Act, 42 U.S.C. § 606(a)[6] and held that "the statutory term 'dependent child' does not include unborn children." at 578, 95 S.Ct. at 1183, 43 L.Ed.2d at 474. In determining that the Social Security Act did not *require* such aid, the Court expressly reserved the issue of the validity of the HEW regulations *permitting* federal participation if a state opts for coverage for unborn children. at 585–88, 95 S.Ct. at 1186–88, 43 L.Ed.2d at 477–

Department of Human Resources and Edwin H. Chapin, Director, Mecklenburg County Department of Social Services.

2. § 606. *Definitions.*
 When used in this part—
 (a) The term *"dependent child"* means a *needy child* (1) who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, and who is living with his father, mother, grandfather, grandmother, brother, sister, stepfather, stepmother, stepbrother, stepsister, uncle, aunt, first cousin, nephew, or niece, in a place of residence maintained by one or more of such relatives as his or their own home, and (2) who is (A) under the age of eighteen, or (B) under the age of twenty-one and (as determined by the State in accordance with standards prescribed by the

Secretary) a student regularly attending a school, college, or university, or regularly attending a course of vocational or technical training designed to fit him for gainful employment; (emphasis added).

3. "Federal financial participation is available in . . . [p]ayments with respect to an unborn child when the fact of pregnancy has been determined by medical diagnosis." 45 C.F.R. § 233.90(c)(2)(ii) (1973).

4. *See* Handbook of Public Assistance Administration, Part IV, § 3412.6 (Nov. 4, 1946).

5. Statistics provided by HEW indicate that as of January 1976 thirty states had elected to opt for benefits.

6. *Supra,* note 5.

79. Finally, having regarded the appeal as purely one of statutory construction, the Supreme Court remanded the case for consideration of constitutional issues not decided. at 588, 95 S.Ct. at 1188, 43 L.Ed.2d at 479.

North Carolina's appeal from the preliminary injunction was decided by the Fourth Circuit following the Supreme Court's decision in *Burns.* *Taylor v. Hill,* 529 F.2d 517 (4th Cir. 1975). In light of *Burns,* ·the Fourth Circuit vacated the preliminary injunction and remanded "for consideration of the constitutional arguments that were raised but not decided below."

Upon remand, plaintiffs on June 12, 1975, applied for the convening of a three-judge federal district court pursuant to 28 U.S.C. §§ 2281, 2284. Plaintiffs' constitutional claim, as recited in the original complaint, alleged that:

13. Defendants' policy of excluding unborn children from entitlement to AFDC benefits violates the Fourteenth Amendment to the Constitution of the United States guarantees to equal protection of the laws because said policy and regulations arbitrarily and capriciously discriminate between unborn children and their needy pregnant mothers and other children and their needy mothers, and because said policy and regulations infringe upon plaintiffs' rights to bear healthy children.

On December 19, 1975, plaintiffs moved pursuant to Fed.R.Civ.P. 15 to amend their original complaint to allege that North Carolina's policy of denying AFDC benefits to unborn children has a racially discriminatory purpose and effect. Other proposed amendments likewise shifted the focus of the original constitutional attack.

On January 12, 1976, eleven days before the scheduled trial date, leave was granted by this court to amend the complaint and to bring the suit as a class action pursuant to Fed.R.Civ.P. 23. Jurisdiction is based in 42 U.S.C. § 1983 and the United States Constitution. The constitutional issues put to us for decision by the plaintiffs in their amended complaint are as follows:

### COUNT I.

23. The policy of North Carolina not to recognize AFDC and Medicaid eligibility for needy women with unborn children, while the state does recognize AFDC and Medicaid eligibility for needy women with born children, is arbitrary and irrational and, therefore, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

### COUNT II.

24. The policy of North Carolina not to recognize AFDC and Medicaid eligibility for needy women with unborn children has a racially discriminatory effect.

25. The policy of North Carolina not to recognize AFDC and Medicaid eligibility for needy women with unborn children derives from North Carolina's historical administration of its AFDC program in a racially discriminatory manner, said program being disfavored throughout its history by state policy makers and administrators, who perceived it as a program serving an inordinately high percentage of black citizens. Said policy, therefore, has a racially discriminatory purpose.

26. The policy of North Carolina not to recognize AFDC and Medicaid eligibility for needy women with unborn children violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because it has both a racially discriminatory effect and a racially discriminatory purpose.

### COUNT III.

27. The policy of North Carolina not to recognize AFDC and Medicaid eligibility for needy women with unborn children deprives said women of the means of securing food, shelter, and medical care. The aforesaid deprivation of the basic necessities of life increases the risks of harm to the health of the needy women and their children so greatly that the needy woman's fundamental rights of privacy to choose between bearing a healthy child and abortion are infringed, all in violation of the Due Process Clause

of the Fourteenth Amendment to the United States Constitution.

Plaintiffs seek declaratory and injunctive relief for themselves and their class defined as "needy pregnant women who are otherwise eligible for AFDC and Medicaid in North Carolina, but who are or have been denied said benefits because of the state's policy not to recognize needy women with unborn children." [7]

## II.

This court makes the following findings of fact:

1. The payment of AFDC benefits for unborn children and their mothers is optional under the terms of a federal regulation found at 45 C.F.R. § 233.90(c)(2)(ii). North Carolina has declined to opt for the payment of AFDC benefits for unborn children and their mothers. Since eligibility for AFDC benefits qualifies recipients for Medicaid, the State's decision not to accept the option means that women in the plaintiff class cannot receive Medicaid benefits through the AFDC program.

2. The paramount reason the State of North Carolina has not opted for payment of AFDC benefits and Medicaid for unborn children and their mothers is cost, and the bona fide belief of the defendants that allocation of tax funds to other equally worthwhile purposes is essential. The State's share of the cost of AFDC is 32 percent and is appreciable in dollar volume.

3. A woman with born children in North Carolina who is eligible for and receiving AFDC benefits will be deemed eligible for Medicaid for prenatal care as soon as the pregnancy of an additional child is diagnosed. Such woman, however, receives Medicaid benefits as the result of her status as an indigent woman with a born child, and in that status is qualified to receive the full range of Medicaid benefits.

4. Official United States Census Reports disclose that the total population of North Carolina in 1970 exhibited the following racial characteristics: 76.8 percent White, 22.2 percent Black, 0.9 percent American Indian, 0.1 percent Other races.

5. The following chart discloses the percentage racial composition of the AFDC program in North Carolina for the period between 1942 and 1973.

| | 1973 | 1971 | 1969 | 1967 | 1961 | 1953 | 1948 | 1942 |
|---|---|---|---|---|---|---|---|---|
| WHITE | 21.7 | 25.5 | 29.0 | 29.7 | 43.9 | 56.1 | 73.0 | 75.0 |
| NEGRO | 75.6 | 73.0 | 68.6 | 69.0 | 54.3 | 42.9 | 27.0 | 25.0 |

The above chart reveals that for these years, blacks have dominated the AFDC program and continue to do so in increasing percentages. Statistics as of August 1975 indicate that 70.9 percent of AFDC beneficiaries for that year were black, while 25.9 percent were white.

6. In recent years, North Carolina has increased AFDC benefits from 86 percent of defined need in 1968–69 to 100 percent of defined need at present. The defined need of a family receiving AFDC benefits is set by the State, and does not conform necessarily to the actual total cost of living for the needy family. The percentage of defined need which a state provides in AFDC benefits often fluctuates, depending upon budgeting and other considerations. The amount of defined need in North Carolina is less than total estimated family living costs, but is formulated so as to approximate basic expenses, such as food, clothing and shelter. The increase from 86 percent to 100 percent of defined need represented a genuine increase in AFDC benefits to eligible recipients.

7. Current AFDC payments for families of four in North Carolina are $200 a month, but the subsistence need for a family of this

7. Order, Civil No. C–C–74–101, W.D.N.C., Charlotte Division (January 12, 1976).

size in North Carolina is approximately $550, according to a 1973 study for the North Carolina Department of Human Resources.

8. The following chart compares annual increases in AFDC payments per recipient with annual increases in the consumer price index.

| Date | (1967=100) Consumer Price Index | Percent Change from Previous Year | Average AFDC Payment Per Recipient (w/F.C.) | Percent Change from Previous Year |
|---|---|---|---|---|
| September 1971 | 122.2 | -- | $32.13 | -- |
| September 1972 | 126.2 | +3.3 | $32.48 | +1.1 |
| September 1973 | 135.5 | +7.4 | $41.48 | +27.7 |
| September 1974 | 151.7 | +12.0 | $42.76 | +3.1 |
| September 1975 | 163.6 | +7.8 | $54.80 | +28.2 |
| | | 30.5 | | 60.1 |

These statistics reveal that the average AFDC payment per recipient for the period covered has risen 60.1 percent, while the consumer price index has risen 30.5 percent.

9. In addition to AFDC, North Carolina participated in a program of old-age assistance, OAA, created under the Social Security Act, 42 U.S.C. § 301, which was a joint federal-state program providing support grants to needy elderly individuals and families. In North Carolina the OAA program was replaced by the Supplemental Security Income Program ("SSI"), 42 U.S.C. § 1381, in January 1974. The SSI program, unlike OAA, is funded primarily by the federal government.

10. The following chart discloses the percentage distribution of aid to recipients of OAA benefits according to race for the years 1960, 1965 and 1970.

PERCENTAGE DISTRIBUTION OF AID TO AGED RECIPIENTS, BY RACE
1960, 1965 & 1970

| Race of Recipient | 1960 | 1965 | 1970 |
|---|---|---|---|
| Total | 100.0 | 100.0 | 100.0 |
| White | 64.8 | 64.9 | 58.4 |
| Negro | 34.1 | 34.0 | 40.5 |
| American Indian | 1.0 | 1.0 | 1.1 |
| Other Known Race | 0.1 | 0.1 | — |

The above chart discloses that a greater percentage of OAA recipients have been and remain white, although this percentage is less than the total percentage of whites in the population. The chart also discloses that during the ten-year period between 1960 and 1970 the percentage of black recipients of OAA benefits has increased by approximately 6½ percent.

11. North Carolina also maintained a program of aid to the permanently and totally disabled ("APTD"), created under the Social Security Act, 42 U.S.C. § 1351, which was also a joint federal-state program providing support grants to needy persons who were permanently disabled, regardless of age. In North Carolina, the APTD program was also replaced by the SSI program in January 1974.

12. The following chart discloses percentage distribution of aid to APTD recipients, according to race for the years 1962 and 1970.

PERCENTAGE DISTRIBUTION OF AID TO
THE DISABLED RECIPIENTS, BY
RACE 1962 & 1970

| Race of Recipient | 1970 | 1962 |
|---|---|---|
| Total | 100.0 | 100.0 |
| White | 52.7 | 60.1 |
| Negro | 45.5 | 39.0 |
| American Indian | 1.8 | 0.9 |

This chart reveals that the percentage of white recipients of APTD benefits, while greater than 50 percent, is less than the total percentage of whites in the state population. This chart further discloses that between 1962 and 1970, the percentage of black recipients of APTD benefits has increased by approximately 6½ percent.

13. The following chart sets forth the average per capita monthly payments to recipients of OAA, APTD, and AFDC for the years 1960 through 1973.

Average Monthly Payment Per Person

| Years | AA | AD | AFDC |
|---|---|---|---|
| 1960 | $40.55 | $45.79 | $19.21 |
| 1961 | 43.16 | 48.74 | 19.84 |
| 1962 | 45.83 | 53.06 | 21.09 |
| 1963 | 49.26 | 56.70 | 21.71 |
| 1964 | 51.30 | 59.03 | 22.42 |
| 1965 | 53.36 | 60.73 | 23.13 |
| 1966 | 55.40 | 62.52 | 23.74 |
| 1967 | 61.37 | 66.82 | 24.88 |
| 1968 | 66.28 | 71.23 | 26.60 |
| 1969 | 71.01 | 74.98 | 29.17 |
| 1970 | 63.25 | 75.65 | 30.48 |
| 1971 | 68.78 | 79.76 | 31.82 |
| 1972 | 74.46 | 82.73 | 32.40 |
| 1973 | 79.65 | 84.97 | 37.46 |

As the chart discloses, in the time period represented welfare benefits for each category have roughly doubled.

14. Although the OAA and APTD programs have been almost totally replaced by the federal SSI program, North Carolina by statute [8] continues to make payments to aged and disabled persons who would formerly have been eligible for OAA and APTD, but who do not now qualify for federal SSI. As of August 1975, these "State/County Special Assistance for Adults" payments, which are totally state funded, averaged $124.05 per month to qualified aged recipients and $128.96 to qualified disabled recipients. The average AFDC payment to qualified recipients as of the same date was $53.89 per month. As of this same date, the qualified aged recipients of these non-SSI payments were 73.5 percent white; qualified disabled recipients, 66.2 percent white; AFDC recipients, 25.9 percent white.

15. Although the State does not accept the AFDC option, medical care is available to some indigent women in North Carolina through other welfare programs.

In Title V of the Social Security Act, codified as 42 U.S.C. §§ 701–708, Congress provided federal funding for prenatal and post-natal health services to mothers and infants, explicitly designed to reduce infant maternal mortality. Title V services are in existence in 71 of North Carolina's 100 counties. While Title V provides limited health services to indigent pregnant women, the program provides no cash grants or food. Title V services available in North Carolina do not include infant delivery costs. A special project under Title V, the Maternal and Infant Care Project, is available in Halifax, Wayne and Warren Counties. In these three counties, indigent women who are considered high-risks for the successful completion of pregnancy receive financial support for delivery costs.

In addition to Title V programs, North Carolina has operated a nutrition and dietary supplement program, the WIC program, which provides nutritious food each month for pregnant and lactating women and their children up to the age of four who are clinically determined to be a nutritional risk. As of September of 1975, 21 counties are covered by the WIC program, and there are waiting lists in all counties where the program is in effect.

---

8. N.C.Gen.Stat. § 108–62.

There do exist counties in North Carolina where neither Title V nor WIC benefits are available to indigent pregnant women.

A new program, the state-funded Perinatal Care Program, will provide services for indigent women with high-risk pregnancies. This program covers at present only five counties.

16. United States Department of Agriculture food coupons are generally available to members of the plaintiff class in North Carolina. The Food Stamp program subsidizes food purchases for eligible pregnant women with no born children, and food purchased with these food coupons contributes significantly to the nutritional well-being of such women.

17. Compared with other states, North Carolina ranks high in infant mortality and morbidity. There is, moreover, a correlation between lack of nutrition for pregnant women and later infant mortality and morbidity. High perinatal mortality and morbidity are significantly associated with low economic status, poor maternal nutrition, teenage pregnancies, and inadequate prenatal care. Despite the programs described above, financial support for perinatal services for medically indigent mothers is insufficient in North Carolina, and such care is lacking in quality and quantity.

18. At one time the State Department of Social Services promulgated and enforced a "continuous relationship" (man-in-the house) rule, which was used to disqualify needy mothers for AFDC benefits if they maintained a common-law relationship with an able-bodied male. The state department formally abandoned this "continuous relationship" rule after notice from the United States Department of Health, Education and Welfare that it was invalid.

19. At one time, the State Department of Social Services conditioned eligibility for AFDC benefits upon written evidence that an applicant was physically incapable of bearing children or that she was receiving contraceptive counselling from a licensed physician or county health director. The State Board's purpose was to reduce out-of-wedlock births in North Carolina by AFDC beneficiaries.

20. During the five-year period 1969–73 there were 61,300 births out of wedlock in North Carolina. From this total, 12,060 were white, representing 3.7 percent of all white births during that period. Forty nine thousand two hundred births out of wedlock were non-white, representing 35.5 percent of all non-white births during that period. Statistics from the North Carolina Board of Health reveal that the majority of persons born out of wedlock over the past 20 years have been non-white.

21. During the eleven months that the preliminary injunction was in effect in this action, the following expenditures were made in compliance with the injunction for unborn children and their mothers (total of 9,570 AFDC cases):

A. State share of AFDC payments estimated at $83,532.

B. State share of Medicaid payments estimated at $163,564.

C. Federal share of AFDC payments estimated at $390,002.

D. Federal share of Medicaid payments estimated at $763,660.

22. During the period when the preliminary injunction was in effect in this action, the total amount of money spent for all AFDC recipients, including foster care, was $89,421,387. During this same period the total amount spent for Medicaid benefits (services only) was $44,236,556.

23. North Carolina has a history of de jure invidious discrimination against blacks. It is possible to marshal the statistical facts found herein to suggest racial discrimination. The "unpopularity" of AFDC with the legislature and the decision of the defendants to refuse to extend it arguably result from black animus. But the facts equally support another conclusion: that blacks are not only fairly treated but disproportionately advantaged by the State's various welfare programs.

### III.

Upon the foregoing findings of fact we conclude that the plaintiffs have failed to establish even a prima facie case of racial discrimination nor is there any proof of invidious purpose. We find *Whitfield v. Oliver,* 399 F.Supp. 348 (M.D.Ala.1975), to be clearly distinguishable.

In *Whitfield, supra,* as the AFDC program became increasingly black, the gap in benefits between AFDC and OAA grew even wider. Such was not the case in North Carolina. Finding of Fact 13 reveals that in the years 1960–1973, when black recipients of AFDC were increasing from 54 percent to 75 percent of total, the benefits for all three welfare programs roughly doubled. *Vis-à-vis* OAA and APTD, AFDC per capita payments were *not* diminished, in spite of the General Assembly's knowledge that the program was becoming black-dominated.

In *Whitfield,* 100 percent of defined need was provided for OAA recipients, while only 55 percent of defined need was available for AFDC. In North Carolina, by contrast, 100 percent of defined need has been provided for recipients in all three programs during recent years. The exception was in the mid-1960's, when a percentage reduction factor was applied to reduce AFDC benefits to 86 percent of need. All the evidence indicates that budgetary constraints, and not racial animus, were responsible for this reduction in benefits. Moreover, in 1968, when black participation in AFDC was almost 69 percent (a fact which, as plaintiffs contend, the General Assembly was well aware), the percentage reduction was removed and benefits again restored to 100 percent of defined need. In absolute dollar terms, payments to AFDC recipients have *never* decreased, indeed, having increased every year despite increasing black participation. Statistics also reveal that increased AFDC payments since 1967 have more than kept pace with increases in the cost of living in inflationary times. During this period, when the consumer price index rose 30.5 percent, AFDC benefits were increased by 60.1 percent. AFDC benefits were thus increasing at a rate twice that of the cost of living, so that in real economic terms the needs of AFDC recipients are being more completely met than at any time in the past.

Another factor which plaintiffs overlook is that, while the majority of OAA and APTD recipients have been white, the percentage of white recipients is as of 1975 far less than the percentage of whites in the general population.[9] As a result, blacks have benefitted from OAA and APTD in numbers in excess of their percentage of the total population. In addition, recent statistics reveal that both OAA and APTD (now included within SSI), are themselves becoming increasingly black. Between 1960 and 1970, black participation in both OAA and APTD increased by roughly 6½ percent while white participation declined by an equal or greater percentage. Strictly speaking, then, all three welfare programs are "black" and becoming more so, indicating that discrepancies among the programs can be explained by factors other than race.

If racial animus is not the reason for excluding unborn children, then what are the State's reasons? Plaintiffs suggest that the State has presented no nonracial justification for its refusal to expand AFDC to cover the unborn. This assertion cannot withstand close scrutiny of the evidence before this court.

To begin with, at the time the optional AFDC funds became available to the State in 1946, North Carolina's AFDC program was more than 70 percent white. Whatever this may suggest regarding the freedom of blacks to apply for AFDC in the 1940's, the statistic does rebut any inference that the *initial* decision not to opt for additional funds was an attempt to limit benefits in a program perceived by the legislature to be black-dominated.

In addition, we must keep in mind that what is challenged in this case is not an *act* by the State, but is rather a refusal to act,

---

**9.** *See* Finding of Fact 4, *supra.*

*i. e.,* the continuing unwillingness to *expand* qualitatively the scope of a welfare program. Proof of one's motive for a positive act is at best difficult, but proof of the State's purpose in maintaining the *status quo* with regard to AFDC and unborn children is well-nigh impossible. A number of nonracial justifications for the State's policy have, however, emerged.

First of all, there is the State's undisputed interest in preserving the fisc.[10] Extending AFDC benefits to unborn children will cost money, and even though the federal government will pay 68 percent of the cost, the remainder must be borne by the State.

Secondly, plaintiffs' own witness, Robert Ward, offered several nonracial reasons for AFDC's "unpopularity" with the General Assembly.[11]

One reason given by the current Secretary of the Department of Human Resources, David Flaherty, for the refusal of his office to recommend expansion of AFDC is that neither the Congress nor the General Assembly ever intended such assistance to be made available within the AFDC framework.[12] Flaherty also reinforced the State's position that it is presently unwilling to assume the additional financial burden of expanded AFDC benefits.

There is not money to do everything for everybody in government, and before we start adding and spreading the part thinner over more programs, we'd better start doing a good job of what we've already assumed responsibility for providing in the state.[13]

Flaherty also expressed the State's concern that such assistance through AFDC is not in the overall best interests of the poor.[14]

Flaherty spoke of state priorities in the area of social welfare programs, indicating that additional health and unemployment assistance, in his official opinion, should rank ahead of expansion of the AFDC program into a completely new area.[15] Flaherty also indicated that expansion of the AFDC program could be done only at the expense of those already eligible and receiving benefits.[16] Given a choice between an increase in benefits to those currently eligible and expansion of the program to cover mothers of unborn children, Flaherty ranked the former alternative as of higher priority.

Finally, since the State is making an effort to meet the prenatal medical and nutritional needs of pregnant women through programs other than AFDC, *see, e. g.,* Finding of Fact 15, *supra,* it is probable that the State perceives no necessity to expand AFDC to meet this same need.[17] From

---

**10.** *See* Finding of Fact 2, *supra.*

**11.** Q. What were the most *reoccurring* and predominant criticisms made of the AFDC program?
A. *Usually relating to the amount of the AFDC grant versus wages, and the difficulty in hiring farm workers, or workers to do general labor, because the AFDC payment was high compared to average wages paid in North Carolina at the time.*
(Emphasis added). Ward Deposition, at 11.

**12.** Flaherty Deposition, p. 19.

**13.** Flaherty Deposition, p. 22.

**14.** *Id.* at 23.

**15.** *Id.* at 33, 35.

**16.** *Id.* at 39.

**17.** Plaintiffs have brought to the attention of the court a number of studies and reports com-

missioned by the State of North Carolina to evaluate existing programs providing prenatal nutritional and medical care and to make recommendations for additional programs. These documents emphasize the persistent, chronic nature of the problem, and unanimously conclude that North Carolina is not doing enough for indigent pregnant women. While these reports underscore the inadequacy of existing programs, at the same time they reflect a continuing concern by the State for these people and a desire to do more to meet their needs. Of particular interest to the court is the realization that, after careful examination of this evidence, *not one* committee or study group recommended extension of AFDC benefits to the plaintiff class as a promising or even desirable way of providing for the medical and nutritional needs of the pregnant poor. We are confident that plaintiffs would agree that the members of these study commissions were genuine in their concern and sincere in their purpose to improve the lot of this unfortunate class of

Secretary Flaherty's comments we can infer that existing programs providing prenatal care reflect the State's present ability and willingness to meet this need. Although these programs are presently inadequate to meet completely the needs of all poor pregnant women, their very existence demonstrates a sensitivity by the State to the problems of the plaintiff class. Once a problem has been identified, the State legislature is in most cases left free to choose and develop its own remedy. This legislative prerogative ought not be interfered with merely because the State has chosen a remedy different from that which the plaintiff class would have preferred. The State has demonstrated to the satisfaction of this court a commitment to provide, insofar as it determines itself able, for the needs of poor pregnant women of all races. The State has not, it is true, chosen AFDC as the vehicle to achieve this goal, but we are unconvinced that the selection of remedy springs from racial considerations. The eligibility standards for AFDC and the Title V and WIC programs are not so different as to support a conclusion that the latter two programs will be any less black-dominated than the former.

In *Jefferson v. Hackney*, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972), the Supreme Court was confronted with a problem similar to the one at bar. In that case, recipients of AFDC benefits in Texas challenged the State's practice of applying a greater percentage reduction factor to AFDC than to other welfare programs. An equal protection claim was made that the distinction between aid programs was irrational and that the Texas system discriminated against the minority racial groups which dominated AFDC.

In rejecting the claim of racial discrimination as an "unproved allegation;" [18] the Court noted:

There has never been a reduction in the amount of money appropriated by the legislature to the AFDC program, and between 1943 and [1969] there had been five increases in the amount of money appropriated by the legislature for the program.

406 U.S. at 547, 92 S.Ct. at 1732.

The Supreme Court also rejected plaintiffs' evidence that AFDC had been "unpopular" with the Texas legislature because 87 percent of AFDC recipients were either black or Mexican-American. *See* 406 U.S. at 575, 92 S.Ct. 1724 (Marshall, J., dissenting).

Appellants in *Jefferson* drew the Court's attention to "substitute father" and "suitable home" regulations enforced by Texas welfare officials until these rules were invalidated in *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). Plaintiffs in this case and the court in *Whitfield* are persuaded that such regulations indicate racial prejudice, but this same argument was made in *Jefferson* to no avail.

The Supreme Court was, of course, aware of the degree to which blacks and other minority groups had been limited in their participation in Texas politics and society,[19] yet such broad historical discrimination was not held sufficient to establish present discrimination in the administration of welfare programs.

In the final analysis, held the Court, "[a]ppellants are thus left with their naked statistical argument: that there is a larger percentage of Negroes and Mexican-Americans in AFDC than in the other programs, and that the AFDC is funded at 75% whereas the other programs are funded at 95% and 100% of recognized need." 406 U.S. at 548, 92 S.Ct. at 1732.

Evidence which the Supreme Court found unconvincing in *Jefferson* was later found

citizens. *See, e. g.,* Governor's Council on Comprehensive Health Planning, Report of the Task Force on Maternal Infant Care (October 29, 1974) ("An important and original objective of the Task Force was that no proposal would be made which did not accurately reflect the counsel and concurrence of the practicing pro-

fessionals actively involved in the delivery of perinatal care.") and appendices thereto.

18. 406 U.S. at 547, 92 S.Ct. 1724.

19. *See, e. g., White v. Register,* 412 U.S. 755, 93 S.Ct. 2342, 37 L.Ed.2d 314 (1973).

persuasive by the district court in *Whitfield*. In the instant case, we find that an awareness by state officials of the racial composition of state welfare programs, a factor absent in *Jefferson*, adds nothing to plaintiffs' proof of discrimination. There has been no showing that this awareness has been expressed by an intent to discriminate. Plaintiffs here, as in *Jefferson*, are "thus left with their naked statistical argument . . . ."

■ The essence of a claim of discrimination is unequal treatment of persons similarly situated. The unequal treatment obvious in this case occurs among needy, pregnant women in North Carolina. Since we hold that there has been no showing of racial discrimination against the plaintiff class, the State will not be required to explain its welfare policies in terms of "compelling state interest." We instead look for evidence of a "rational basis" which is consistent with the requirements of the federal constitution.

### IV.

■ Plaintiffs' next claim is that denial of AFDC benefits to the unborn violates the constitutionally-protected, fundamental right of privacy of all women within the plaintiffs' class. The argument is so wholly without merit it is difficult to articulate. The gist is that denial of welfare benefits in effect denies the right to have a baby and therefore forces a member of the plaintiff class to have an abortion. The State's policy thus interferes with the woman's privacy right to *choose* between bearing a healthy child and terminating pregnancy by abortion.

It is enough to say this case is not like *Roe v. Norton*, 408 F.Supp. 660 (D.Conn. 1975), cited by plaintiffs, and is like *Murrow v. Clifford*, 404 F.Supp. 999 (D.N.J.1975) wherein a three-judge district court upheld New Jersey's denial of AFDC benefits to needy pregnant women with no born children. Plaintiffs had challenged the policy as violative of their constitutional right to procreate, but the court found no impairment of that right, "other than in a remote and tenuous fashion." 404 F.Supp. at 1001. Emphasizing that prenatal care was available, as here, through Title V programs, the court concluded "that the state policy which plaintiffs challenge is not violative of the Constitution." 404 F.Supp. at 1004.

We hold that the state policy challenged here does not violate plaintiffs' right to an elective abortion under *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

### V.

Plaintiffs' final claim is couched in the more traditional language of equal protection. Plaintiffs contend that, even without racial discrimination, or interference with the right of privacy, or denial of any other "fundamental right," the State cannot justify its policy on any "rational basis." *E. g., United States Dept. of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). Plaintiffs argue that even under this less exacting standard of review, the State has failed to demonstrate any legitimate interest reasonably related to the different benefits made available to needy pregnant women with born children and needy pregnant women with none.

As pointed out, *supra*, denial of equal protection requires disparate treatment of those similarly situated. *Johnson v. Robison*, 415 U.S. 361, 375, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974). Plaintiffs here presume that women currently eligible for AFDC and women in the plaintiff class are "similarly circumstanced." *Id.* This presumption is unwarranted and in a sense begs the question here in issue.

■ The "F" in AFDC stands for "Families." Section 401 of the Social Security Act, 42 U.S.C. § 601, states the purpose of AFDC is to give assistance to eligible *family units* for the benefit of the dependent child. *Burns v. Alcala, supra,* held that a fetus is *not* a dependent child. We are persuaded that there are sufficient differences between a "family unit" and a pregnant individual with no children to take this case out of traditional equal protection analysis. The needs of pregnant women

and those of needy women with a family to support *are* different, and justify different remedies. *See Burns, supra* 420 U.S. at 583–84, 95 S.Ct. 1180. Among the plaintiffs here there is no "family" to aid. There is in this case a difference in welfare benefits available to the plaintiff class and needy women with born children. The different needs and responsibilities of the two groups, however, belie the suggestion that they are "similarly situated."

Even presuming, *arguendo*, that the two groups *are* similarly situated, the State has demonstrated a sufficiently "rational basis" to satisfy the equal protection clause. Some of the reasons given by the State to justify its policies have been discussed, *supra*. To summarize, the State here contends that its policy:

 a. preserves the integrity of the state welfare budget

 b. creates an incentive for women without family responsibilities to seek gainful employment rather than depend upon welfare

 c. implements the intention of Congress to limit AFDC benefits to families with born children

 d. enables the State to provide maximum benefits to those needy families currently eligible for AFDC and prevents a reduction in such benefits in order to expand AFDC to include unborn children

 e. reflects the State's priorities among social welfare programs as determined by the General Assembly and State officials

 f. prevents duplication of welfare benefits, since prenatal nutritional and medical care is currently available to a large percentage of needy pregnant women through other welfare programs.

"[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. . . . The Legislature may select one phase of one field and apply a remedy there, neglecting the others. . . ." *Williamson v. Lee Optical Co.,* 348 U.S. 483,

489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). "There is no question that States have considerable latitude in allocating their AFDC resources, since each State is free to set its own standard of need and to determine the level of benefits by the amount of funds it devotes to the program." *King v. Smith,* 392 U.S. 309, 318–19, 88 S.Ct. 2128, 2134, 20 L.Ed.2d 1118 (1968).

We believe that North Carolina has shown a rational, noninvidious basis for its failure to expand its AFDC program to encompass unborn children. As the Supreme Court pointed out in *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970):

 In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." [citation omitted] "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." [citation omitted] "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." [citation omitted]

 . . . [T]he Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy.

 . . . We need not explore all the reasons that the State advances in justification of the regulation. It is enough that a solid foundation for the regulation can be found in the State's legitimate interest in encouraging employment and in avoiding discrimination between welfare families and the families of the working poor. . . .

 . . . But the Equal Protection Clause does not require that a State must choose between attacking every aspect of

a problem or not attacking the problem at all. [citation omitted] It is enough that the State's action be rationally based and free from invidious discrimination.

. . .

. . . [T]he intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court. The Constitution may impose certain procedural safeguards upon systems of welfare administration [citation omitted]. But the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients. [citations omitted]

397 U.S. at 485–487, 90 S.Ct. at 1161–1163.

Regarding North Carolina's decision to approach the problem of prenatal nutrition and medical care through Title V rather than AFDC, language from *Jefferson v. Hackney, supra,* is instructive:

A State is free to participate in one, several, or all of the categorical assistance programs, as it chooses. It is true, that each of the programs is intended to assist the needy, but it does not follow that there is only one constitutionally permissible way for the State to approach this important goal.

. . . So long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and needy are not subject to a constitutional straitjacket. The very complexity of the problems suggests there will be more than one constitutionally permissible method of solving them.

406 U.S. at 546–47, 92 S.Ct. at 1731.

With respect to North Carolina's priorities in the field of social welfare programs, particularly AFDC versus OAA and APTD, the Supreme Court, again in *Jefferson v. Hackney,* has recognized the States' broad discretion in such matters.

[T]he State may have concluded that the aged and infirm are the least able of the categorical grant recipients to bear the hardships of an inadequate standard of living. While different policy judgments are of course possible, it is not irrational for the State to believe that the young are more adaptable than the sick and elderly, especially because the latter have less hope of improving their situation in the years remaining to them. Whether or not one agrees with this state determination, there is nothing in the Constitution that forbids it.

406 U.S. at 549, 92 S.Ct. at 1733.

■ Inherent in the concept of optional federal funding is the prerogative of the State to refuse it. The Social Security Act does not require that the plaintiff class receive AFDC; the HEW regulation, if valid, only permits it; and the Constitution's only concern is that the decision to accept or reject the funds not be made in an arbitrary and capricious manner or for invidious or irrational reasons. We hold that North Carolina's policy and the reasons for it do not conflict with the Constitution, the Act, or the HEW regulation.

## VI.

The court makes the following conclusions of law:

a. Plaintiffs have failed to establish a *prima facie* case of racial discrimination in the administration of North Carolina's social welfare programs and policies.

b. Plaintiffs have failed to prove any invasion of or interference with plaintiffs' constitutionally-protected privacy, expressed in terms of the right to an elective abortion or the right to procreate.

c. North Carolina has a rational basis for maintaining its policy of refusing to expand AFDC coverage to include the plaintiff class.

d. Plaintiffs and needy pregnant women with born children are not so similarly situated that their different treatment by the State invokes the equal protection clause of the fourteenth amendment.

e. Plaintiffs have failed to prove a violation of their constitutional rights by the defendants.

Accordingly, judgment will be and is hereby entered for the defendants, and the plaintiffs' claims for relief are

*DENIED.*

McMILLAN, District Judge (dissenting):

This is a trial court; we sit as a jury and must weigh the evidence.

Plaintiffs contend that the AFDC program is labeled and considered and treated as a "black" program, and is administered in a fashion which discriminates against AFDC beneficiaries because most of them are black. They further contend that the refusal of North Carolina to opt for AFDC and Medicaid benefits for otherwise qualified pregnant women is a part of this racial discrimination.

The evidence strongly supports the contentions of the plaintiffs.

David T. Flaherty, Secretary of the North Carolina State Department of Human Resources, agreed that the objective of the AFDC program is to provide "subsistence for indigent children and their mothers" and further testified: "but we're not doing it in North Carolina to the extent that we should. . . . And it came out from the Research Triangle that we were only providing fifty percent of what it takes for a family of four to get along in North Carolina." (Flaherty deposition, page 14.)

"I oppose vehemently the effort to add, in a subversive way, another aspect to a program that the Legislature and no one else supported."

"Q. In other words, the AFDC program is not popular with the General Assembly?

"A. It's not popular with the people of the state . . . ." (Flaherty deposition, pages 22–23.)

"We're providing right now fifty percent of what it takes for AFDC—" (Flaherty deposition, page 24.)

"North Carolina has one of the highest [perinatal mortality and morbidity rates], and we have a particular problem where the blacks are double the loss by death of the whites." (Flaherty deposition, page 28.)

"The State does not provide AFDC or Medicaid to pregnant women because it was never intended by the General Assembly that it would . . . ." (Flaherty deposition, page 38.)

"I had a twenty-seven million dollar surplus in my budget last year in the Department of Human Resources." (Flaherty deposition, page 68.)

The testimony of the former Deputy Director, Mr. Ward, includes the following:

"Q. Would it be fair to say that through the years the level of AFDC benefits has been low in relation to the actual need, as recognized by the Department?

"A. Yes, I believe I can say that very comfortably. That it was not founded on a sound cost-of-living basis." (Ward deposition, page 9.)

\* \* \* \* \* \*

"Q. Would it be fair to say that the AFDC program over the years has been viewed by members of the General Assembly as an unpopular program?

"A. Generally, yes.

"Q. Have members of the General Assembly ever asked you, personally, as a representative of the State Department of Social Services for statistics reflecting the racial breakdown of these various programs?

"A. Yes." (Ward deposition, pages 9–10.)

\* \* \* \* \* \*

"A. The ratio, to my knowledge, was always above fifty-five percent in my history with the agency. Fifty-five percent black.

"Q. Did members of the General Assembly and county Commissioners, in any of the conversations with you

"A. about the AFDC program, make specific criticisms about the AFDC program?

"A. Yes.

"Q. What were the most reoccurring and predominant criticisms made of the AFDC program?

"A. Usually relating to the amount of the AFDC grant versus wages, and *the difficulty in hiring farm workers, or workers to do general labor, because the AFDC payment was high compared to average wages paid in North Carolina at the time.*

"Q. Okay, that's what you would say would be the most reoccurring criticism?

"A. That, *and race was always an issue.*

"Q. When you say 'that,' you mean *legislators and county commissioners made criticisms of the program that related to the fact that the program was primarily a black program or that they perceived it that way?*

"A. *Yes, that's right. And it made it difficult for the labor market.*

[ALL ABOVE EMPHASIS ADDED.]

"Q. Based upon your conversations with members of the General Assembly again, and county commissioners, would it be fair to say that the racial composition of the AFDC program was a substantial factor in the determination of the level of benefits budgeted by the General Assembly for the AFDC?

"A. It's hard to give weight to that. Generally, yes.

"Q. (By Mr. Hart) Were the Old Age and the APTD programs viewed as predominantly white programs?

\* \* \* \* \* \*

"A. Yes.

"Q. (By Mr. Hart) During the 1960's, did certain eastern North Carolina counties systematically cut large numbers of persons off the AFDC rolls during certain periods of the year?

"A. Yes. I had it called to my attention by field representatives at various times that some counties during the summer farm season, when farm labor was needed, some counties would reduce their AFDC rolls, whether the particular client had a job or not.

"Q. What justification, if any, did these field representatives or county commissioners or county directors in those counties offer in support of these seasonal terminations?

"A. That there was enough work for everyone if they would merely go and ask for it.

"Q. (By Mr. Hart) If I could pursue this for just a minute, the justification was—I thought I heard you say there were enough jobs available. Was a part of that, also, any expressed concern in those counties for the need for labor?

"A. Yes.

"Q. And was it a specific need that you heard mentioned for any particular kind of labor?

"A. Mostly farm labor.

"Q. Did you ever hear it said that, as a justification for that, that it was a need for cheap, black labor?

"A. Yes, it has been said.

"Q. (By Mr. Hart) Was the State Department generally aware of this practice of seasonal lay-offs in certain counties?

"A. Yes.

"Q. And did the State Department, to your knowledge, take action to stop this practice?

"A. They took action through negotiation, and over a period of years I understand it has been stopped. But there was no legal action, to my knowledge.

"Q. Does the General Assembly determine how much the state will put up for its share of AFDC, OAA, and APTD allocations each year?

"A. Yes, if I understood you correctly. They determine the amount of dollars, not the percentage. That is, based on the federal percentage.

"Q. Yes, sir, that's what I was asking.

"A. Right." (Ward deposition, pages 11, 12, 13, 14. Emphasis added.)

\* \* \* \* \* \*

"Q. So would it be fair to say that Mr. Howison's and Dr. Blackmon's concerns about children born out of wedlock were primarily concerns about black births out of wedlock and their relation to the AFDC program?

"A. That was to be in my opinion. In my opinion, that was their chief concern." (Ward deposition, page 17.)

"Q. Can you remember specifically whether any legislators ever told you that they would oppose raising AFDC benefits because it was a black program?

\* \* \* \* \* \*

"A. I believe those words might have been used, but by a very few. Mostly, they would say that it had no support from their constituency, that it was not a good political move to support higher AFDC payments, because there was no lobby, no strong community movement to insist that legislators respond to that need.

"Q. (By Mr. Hart) So then although you don't remember many legislators using those exact words, is it your interpretation that that was the thrust behind a lot of objections?

"A. That was a part of it, in my opinion." (Ward deposition, page 26.)

"Q. It is accurate also according to your experience, isn't it, that the Department's request for a budget in AFDC is somewhat a function of their view of what the General Assembly will realistically grant them, isn't it?

"A. I would say that comes into consideration, yes.

"Q. And that's true not only now, but has been true during the years when you were Deputy Commissioner, isn't it?

"A. Yes." (Ward deposition, pages 38–39.)

\* \* \* \* \* \*

The Old Age Assistance program and the Aid to the Permanently and Totally Disabled are thought of as "white" programs, and are funded at figures more nearly approaching the cost of subsistence.

The North Carolina General Assembly is a white group (with one or two strays in recent years); the Directors of Social Services in most counties are all white; the management of the Social Services operation is ninety-seven percent white; and the history of North Carolina is that up until 1969, there were scores of laws on the books requiring racial segregation in all public and many private areas of life.

With this background of racial segregation and discrimination, and with the "black" AFDC program noticeably underfunded compared to the "white" programs, and in view of the legislative attitude and the testimony above quoted, the plaintiffs have made out a showing which puts the burden upon the defendants to demonstrate non-racial reasons for the racially discriminatory results of their failure to opt for AFDC benefits for needy pregnant women.

The fact that white mothers are also losers in the program does not prove lack of racial motive; it simply shows that white people caught up in a "black" program are also victims of racial bias.

Plaintiffs have demonstrated that the actions and inactions of the state in administering the AFDC program have both discriminatory purpose and discriminatory effect. Therefore, defendants must demonstrate a compelling state interest to support their actions. *Jefferson v. Hackney,* 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d at 285 (1972); *Whitfield v. Oliver,* 399 F.Supp. 348 (M.D.Ala.1975).

The evidence does not demonstrate to me that protection of the state's treasury is the purpose of the state's actions; there is talk in the testimony of such a purpose, but it is not persuasive and the dollar amounts involved, measured against the $27,000,000 surplus in this particular department, make bona fide protection of the fisc a very dubious explanation.

The evidence does not support the majority's findings or assumptions (Finding No. 15) that the group represented by the plaintiffs can get adequate medical care without the Medicaid which the state denies them.

The state's abandonment of the "man in the house" rule after being forced to do so is not proof that the discrimination it evidenced has been eliminated.

The evidence does not justify the finding that food stamps are "generally available" to the plaintiffs; unless they have money to buy food stamps, it should not be found that "food purchased with these food coupons contributes significantly to the nutritional well being of such women." (Finding No. 16.)

The majority argue (page 1029) that "proof of the State's purpose in maintaining the status quo with regard to AFDC and unborn children is well-nigh impossible."

That depends upon whether the evidence is read in its entirety or whether the evidence is marshalled in opposition to any proof of improper motive.

The majority as I read the opinion have marshalled the evidence in support of a view that saving the state money rather than racial motives explains the actions of the defendants.

After reading the documentary evidence, and after hearing the live testimony which I had the opportunity to hear, I am unable to agree that it supports that conclusion.

I believe plaintiffs have established a *prima facie* case of racial discrimination; that the defendants have failed to advance adequate non-racial reasons for the discrimination; and that the plaintiffs, black and white, are the victims of unconstitutional racial discrimination.

I dissent.